**Pamela J. TORRE, and Pamela J. Torre as guardian and next friend of Trisha B. Torre, Plaintiffs,**

v.

**FEDERATED MUTUAL INSURANCE COMPANY, Federated Mutual Insurance Company Medical Plan # 501; John Cummings, Medical Plan # 501 Administrator; William Haegele, a/k/a Bill Haegele, Regional Manager; Thomas Lauritzen, a/k/a Tom Lauritzen, Federated Mutual Insurance Company District Manager; John Cummings, Individually; William Haegele, a/k/a Bill Haegele, individually; Thomas Lauritzen, a/k/a Tom Lauritzen, individually, Defendants.**

Civ. A. No. 91–4235–DES.

United States District Court, D. Kansas.

Aug. 4, 1995.

Cheryl D. Myers, Michael B. Myers, Myers & Myers, Topeka, KS, for plaintiffs.

Arthur E. Palmer, Goodell, Stratton, Edmonds & Palmer, Topeka, KS, R. Scott Davies, Minneapolis, MN, for defendants.

### MEMORANDUM AND ORDER

SAFFELS, District Judge.

## I. INTRODUCTION

Pamela Torre brought the instant action alleging the following: (1) sex discrimination in violation of Title VII of the Civil Rights Act of 1964; (2) various violations of the Employee Retirement Income Security Act of 1974 ("ERISA"); (3) discrimination in violation of Minnesota Statutes Chapter 62A; (4) breach of employment contract; (5) intentional infliction of emotional distress; and (6) tortious interference with prospective business advantage. The parties moved for summary judgment. The court issued a Memorandum and Order, filed by the Clerk May 31, 1994, denying Mrs. Torre's motion and granting-in-part and denying-in-part defendants' motion. More specifically, the court granted defendants' motion as to Mrs. Torre's Minnesota Statutes Chapter 62A, tortious infliction, and tortious interference claims; and the court granted-in-part and denied-in-part defendants' motion as to Mrs. Torre's Title VII, ERISA, and breach of contract claims. Plaintiffs moved for reconsideration. The court denied their motion in a Memorandum and Order filed August 4, 1994. The court bifurcated the instant action for trial. The parties tried Mrs. Torre's contract claim to a jury; [1] immediately there-

1. On October 4, 1994, the jury returned a plaintiff's verdict of $320,000: $120,000 for past loss and $200,000 for future loss.

after, the parties tried the remaining claims to the court.

After thoroughly reviewing the testimony of the witnesses (both those who testified at trial and by deposition) and examining the numerous exhibits, the court makes the following findings of fact and conclusions of law. Fed.R.Civ.P. 52(a).

## II. *FINDINGS OF FACT*

For the purposes of clarity and convenience, the court organizes its findings into the following four interrelated subsections: "Parties," "Witnesses," "Health Benefits," and "Employment Discrimination." [2]

### A. *Parties*

1. Defendant Federated Mutual Insurance Company ("Federated") has its corporate offices in Owatonna, Minnesota. Federated is a mutual insurance company selling property, casualty, group health and life, and personal lines of insurance. It concentrates its efforts on selling insurance to small and medium sized retail businesses. Its customers include auto dealers, contractors, equipment dealers, machine shops, petroleum marketers, tire dealers, and wholesalers. It also provides professional counsel, loss prevention, and claims services as "value added" components to its insurance products. Federated's commercial divisions issue and service insurance policies for their assigned states. Kansas is within Federated's Central Division. Marketing Representatives ("MRs") provide direct client contact and are responsible for selling insurance within the divisions. Federated assigns a sales territory to each MR. For administrative and supervisory purposes, MRs report to District Marketing Managers ("DMMs"). DMMs report to Regional Marketing Managers ("RMMs").

2. Federated Mutual Insurance Company Medical Plan # 501 ("Plan # 501 or the Plan") is an "employee welfare benefit plan" under 29 U.S.C. § 1001, *et sequitur.* Federated issued the policy that is Plan # 501 and

also is named as Plan # 501's ERISA administrator.

3. Plaintiffs name John Cummings both as plan administrator and individually. Defendant John Cummings was a Senior Health Claims Manager who supervised various aspects of Trisha Torre's health benefits claim and was involved in some allocation decisions. He was not an officer. He is not the named administrator or fiduciary of Plan # 501; furthermore, he did not hold himself out as such. In a Memorandum and Order filed December 3, 1990, the court dismissed Mr. Cummings as plan administrator and individually. The court finds there was no evidence presented at trial sufficient to subject Mr. Cummings to liability either as plan administrator or individually.

4. Plaintiffs name William Haegele both as Federated manager and individually. Defendant William Haegele was the RMM in charge of the district and territory in which Mrs. Torre was located. Mr. Haegele's region included Kansas, Missouri, and Nebraska. Mrs. Torre failed to name Mr. Haegele in her state or federal sex discrimination administrative charges. In a Memorandum and Order filed December 3, 1993, the court dismissed Mrs. Torre's Title VII clams against Mr. Haegele.

5. Plaintiffs name Thomas Lauritzen both as Federated employee and individually. Defendant Thomas Lauritzen was the DMM in charge of Mrs. Torre's district. Mrs. Torre failed to name Mr. Lauritzen in her state or federal sex discrimination administrative charges. In a Memorandum and Order filed December 3, 1993, the court dismissed Mrs. Torre's Title VII claims against Mr. Lauritzen.

6. Pamela Torre is the principal plaintiff; she brings claims on her own behalf and on behalf of her daughter, Trisha Torre.

7. Pamela Torre was a MR for Federated. She signed an employment contract with Federated February 10, 1988. Mrs. Torre received training at Federated's headquar-

---

2. As in the May 31, 1994, Memorandum and Order, the court divides the factual section only in an attempt to organize a somewhat confusing series of events. The parties should not infer from the structure of the opinion that the court considered any one of the subsections in isolation. When formulating the "Conclusions of Law," the court viewed the facts in their totality.

ters in Owatonna, Minnesota, in March of 1988. Federated assigned her a sales territory in Kansas. She continued as a MR in this territory until March 30, 1992. On March 30, 1992, Mrs. Torre applied for and was granted short term disability status. She qualified for long term disability benefits October 1, 1992. At the time of trial, she was on disability leave.

8. Trisha Torre is Pamela Torre's minor daughter. Trisha is a dependant covered under Plan # 501. She received health benefits under the Plan.

### B. *Witnesses*

9. Of the witnesses who testified at the bench trial, the court finds that the testimony given by the following was not credible: Charlotte White and Doug Crable. Ms. White is a disgruntled former Federated employee who was fired for cause by Mr. Haegele. Mr. Crable is a relative of plaintiff's and former Federated employee. The court has given their testimony no weight.

### C. *Health Benefits*

10. Trisha Torre was born in 1978. She was three months premature and weighed two pounds, three ounces. She suffered various health complications, including heart valve problems and underdeveloped lungs; as a result, she was placed in the intensive care unit for several weeks. At the age of one and one half years, she had heart surgery. Shortly thereafter, she began to show signs of hyperactivity.

11. Federated interviewed Mrs. Torre for employment in December of 1987. She signed an employment contract with Federated February 10, 1988. She and Trisha immediately received coverage under Plan # 501. Plan # 501 has lifetime maximum coverage limits of $1,000,000 for medical ben-

efits and $50,000 for mental/nervous benefits.[3]

12. On November 9, 1989, the Hillside Unit of Menninger's Children's Hospital admitted Trisha for short term treatment and in-patient evaluation. Prior to admission, Menninger contacted Federated's group health claims department to request pre-approval for payment of mental/nervous benefits.

13. At some point in their evaluation of Trisha, the medical personnel at Menninger concluded she would be better served at another facility—more specifically, as Dr. Kearns later explained in a report dated December 26, 1989, she would be better served at a "skilled residential treatment center or medical psychiatric center" with "special educational components." During late November and early December of 1989, Mrs. Torre tried to locate another suitable facility.

14. On November 28, 1989, the Devereaux Foundation, a residential treatment facility in Chester, New Jersey, contacted Federated to request pre-approval for "benefits for in-patient m/n [mental/nervous] treatment."

15. On December 4, 1989, Mrs. Torre telephoned Federated's Health Claims Department regarding the allocation of Trisha's benefits under Plan # 501's mental/nervous limit. She explained to Lori Abbe that Trisha suffered from a physical condition which caused behavior problems. Ms. Abbe told her that Federated needed a letter from Trisha's physician describing the diagnosis. On December 11, 1989, Dr. William Kearns, Trisha's treating physician at Menninger, telephoned Federated and spoke with Ms. Abbe about his diagnosis. He provided a list of diagnostic codes from the International Classification of Diseases, 9th Edition ("ICD9").[4] Ms. Abbe summarized their con-

---

**3.** Plan # 501 defines "mental illness" as follows: "*[m]ental illness* means a mental disorder or a functional nervous disorder and *includes psychiatric or psychological treatment of any physical condition.*" (Emphasis added).

**4.** The ICD9 codes are standard indexing tools recognized by health organizations throughout the world. Dr. Jerry Tomasovic, Trisha's treat-

ing physician at Laurel Ridge, explained that he uses the ICD9 codes and they are useful in communicating diagnoses.

Federated's claims department and its Medical Support Group routinely refer to ICD9 codes when making allocation decisions between Plan # 501's medical and mental/nervous limits.

versation with the following notation in her phone log: "[h]e feels her dx [diagnosis] is primarily organic medical condition and secondary is psychological."

16. On December 13, 1989, Mrs. Torre telephoned Federated and spoke with Fran Janous, a Senior Health Claims Supervisor in Federated's Health Claims Department.[5] Ms. Janous's telephone record reflects that Mrs. Torre explained her understanding that Trisha's problem was physical and not mental and related her concern about whether the Devereaux Foundation would be covered. Ms. Janous told Mrs. Torre Trisha needed to be placed in a facility covered by contract and "Devereaux just doesn't appear to be a covered facility under contract." Ms. Janous also explained that if Trisha were hospitalized in Minnesota, Minnesota law would prevent the enforcement of the Plan's $50,000 mental/nervous limit.[6] Since the Devereaux Foundation had a branch in Florida, Ms. Janous told Mrs. Torre she would call Federated's office in Tampa to check if Florida had a similar law.[7] Ms. Janous's telephone log shows that she spoke with Dawn Schmidt in Federated's Tampa office, but Florida had no analogous law.

17. On December 18, 1989, a representative from Laurel Ridge Hospital in San Antonio, Texas, telephoned Federated, and spoke with Ms. Abbe, to request pre-approval of the delivery of in-patient benefits to Trisha. Trisha had not yet been admitted. Ms. Abbe's telephone log includes a notation that Laurel Ridge was a licensed psychiatric hospital. Her log also indicates Laurel Ridge's request regarded "m/n [mental/nervous] inpatient benefits."

18. A representative from Menninger telephoned Federated December 19, 1989, and spoke with Ms. Abbe regarding Trisha's impending discharge December 21, 1989. Ms. Abbe also received a telephone call December 19, 1989, from Mrs. Torre who wanted to know if Federated had decided whether Laurel Ridge was covered under the Plan.

19. Federated maintains a Medical Support Group ("MSG"). The MSG is an adjunct to the Health Claims Department. It provides support to the Health Claims Department when difficult medical questions arise. Although it is an adjunct to the Health Claims Department, the MSG has separate managers and supervisors. Cyndee Trenda is a Registered Nurse who worked in the MSG during the time relevant here. In part, her job involved reviewing the ICD9 coding of bills to verify that a provider's billing was appropriate—that is, to make sure the provider was charging the patient only for care related to the diagnosed condition. She also had authority to refer cases to peer review organizations for independent review of complicated questions.[8] When she sent a case to a peer review organization, she drafted the questions presented to the reviewer assigned by the organization.

20. Ms. Janous was unfamiliar with Laurel Ridge. On December 19, 1989, she contacted Ms. Trenda at the MSG for assistance. Because Ms. Trenda also was unfamiliar with Laurel Ridge, she suggested Ms. Janous contact the Texas Medical Foundation ("TMF"), a peer review organization with which Ms.

---

5. The Health Claims Department is located in Owatonna, Minnesota. At the time relevant here, John Cummings was the Manager of the Health Claims Department. He was Ms. Janous's immediate superior. When Mr. Cummings was out of the office, Ms. Janous served as the Acting Health Claims Manager.

6. Paragraph four of Rider three to Plan # 501 harmonizes the policy with the Minnesota law mentioned by Ms. Janous. Paragraph four provides that "[t]he policy will provide coverage for the treatment of emotionally handicapped children in a licensed residential treatment facility, as defined by the State of Minnesota."

7. In plaintiffs' objections to defendants' proposed findings and conclusions, Mrs. Torre seems to

dispute that Ms. Janous ever told her Ms. Janous was going to search for facilities in Florida; however, Mrs. Torre's own "diary" belies her objection. See Plaintiffs' Exhibit 286, entry for 12–13–89 (noting that "[Ms. Janous] was going to contact Tampa, FL office and check Florida since Devereaux had a location there").

8. Peer review organizations grew out of the Medicare program. Typically, a peer review organization contracts with physicians to review the care rendered by other physicians; apparently, their reviews chiefly are concerned with cost, necessity, and appropriateness issues. The Texas Medical Foundation is such an organization.

Trenda was familiar. Ms. Janous took Ms. Trenda's suggestion and contacted the TMF December 19, 1989; however, the TMF also was unfamiliar with Laurel Ridge. Ms. Janous then telephoned Laurel Ridge to inquire about its facilities. She made notes of her conversation in her telephone log. She noted that Laurel Ridge was a psychiatric hospital and the average length of stay for acute care was 30–90 days. She also noted that "Trisha needs acute care."

21. On December 20, 1989, Ms. Janous again spoke with Laurel Ridge. She advised Laurel Ridge of the Plan's pre-certification requirement. Laurel Ridge promised to fax a letter discussing the facility and containing a tentative treatment plan.

22. Federated subsequently received a cover letter and packet of general information from Laurel Ridge's Admissions Director. The cover letter stated that "[p]atients in our program are under the joint care of a child psychiatrist and pediatric neurologist." The general information submitted with the cover letter also explained that patients are cared for by an "interdisciplinary treatment team" consisting of the following specialists: "a psychiatrist, neurologist, psychologist, neuropsychologist, speech/language, educational and nutritional specialists, as well as other health care professionals." Also among the items of general information was a section entitled "program-highlights." The opening paragraph of this section began "[i]ntroducing the Neuropsychiatric Program at Laurel Ridge...." The section explained that the "common denominator" of the patients served by Laurel Ridge's "Neuropsychiatric Program" was "the dysfunction of the mental and neurological systems." The "program-highlights" section also explained that "[t]herapeutic pro-

grams are implemented using a sophisticated combination of psychiatric, neuropsychological, developmental, psychosocial, behavioral, and rehabilitative/educational modalities."

23. On December 20, 1989, in an effort to expedite the pre-certification process, Ms. Janous telephoned Ann Harmless, a representative of the Menninger Foundation.[9] Ms. Harmless described the Menninger Foundation as a "private psychiatric hospital." She explained that Trisha suffered from "organic personality syndrome and that her problems are organic in nature but the symptoms come out in behavioral and emotional problems." She also explained that she thought Laurel Ridge's program would be helpful. Ms. Janous's telephone log notes that Menninger's written report would not be available until at least two weeks after Trisha's discharge on December 21, 1989.

24. Chapter VII of Federated's CHIPS Manual, entitled Group Health & Life Coverage for Federated Employees, provides, in part, that "[i]f there is any disagreement with an employee regarding a claim, the division office will immediately mark the file 'correspondence' and will send a complete copy of the pertinent information in the file to the Home Office General Claims Manager." During the time relevant to the instant action, Lyle Templer was the Home Office General Claims Manager. On December 20, 1989, after he received a telephone call earlier in the day from Mrs. Torre,[10] Mr. Templer telephoned Ms. Janous to ask that she make Trisha's claim a "Home Office claim."

25. Ms. Janous sent a memorandum, dated December 27, 1989, to Mr. Templer regarding Trisha's claim. In the memorandum, Ms. Janous reviewed the history of Trisha's claim,[11] described the payments

---

**9.** The conversation was recorded. Federated prepared a transcript the following day, December 21, 1989.

**10.** Mr. Templer's notes indicate Mrs. Torre called him to express her concern regarding the allocation of Trisha's medical expenses. Mrs. Torre believed Trisha suffered from a physical condition; therefore, as she understood the Plan, the expenses were being misallocated under the mental/nervous limit.

**11.** The history supplied by Ms. Janous can be summarized briefly as follows: coverage became effective in February of 1988; Federated's first indication of a possible claim was November 11, 1989, when Menninger telephoned asking for benefits in connection with a mental/nervous condition; however, as of that date, Trisha had not yet been admitted; Menninger admitted Trisha November 9, 1989; Mrs. Torre telephoned December 4, 1989, to explain her understanding that Trisha suffered from a physical and not a "mental/nervous" condition; on December 11,

made,[12] described how the payments were allocated between Plan # 501's medical and mental/nervous limits,[13] discussed the problems she perceived to exist,[14] and asked his advice on six specific issues. Ms. Janous also recommended that the MSG be asked for assistance with the claim. At the end of her memorandum, Ms. Janous referred Mr. Templer to her telephone log from December 27, 1989. On that date, Mrs. Torre telephoned to request Trisha's case be reviewed by a "child psychiatrist."[15]

26. On December 27, 1989, Mr. Templer reviewed Ms. Janous's memorandum. Mr. Templer and Ms. Janous also met on the morning of December 27, 1989, to discuss Trisha's claim. Based on his review of Ms. Janous's memorandum, and his discussions with her regarding Trisha's claim, Mr. Templer made several decisions which he included in a memorandum prepared December 28, 1989. In the memorandum, he wrote that Federated would recognize Laurel Ridge as a qualified hospital under the Plan and he directed Ms. Janous to contact Intracorp to request that it conduct pre-admission certification and continued stay review at Laurel Ridge. He also instructed Ms. Janous to explain to Mrs. Torre that, at least initially, Trisha's expenses would be allocated under the mental/nervous limit and to inform Mrs. Torre that once Federated received previously requested information from Menninger, Federated would have the MSG hire an inde-

pendent consultant to review Trisha's claim and assist Federated in determining how her expenses should be allocated under the Plan.

27. In late December 1989, Mrs. Torre met with her new DMM Tom Lauritzen.[16] Mr. Lauritzen discussed several topics with her, including the possibility that she open a joint office in Topeka. At some time during the course of the meeting, Mrs. Torre told Mr. Lauritzen of her concerns regarding Trisha's health claim. Until this meeting, Mr. Lauritzen was unaware of Trisha's claim. He immediately set up a meeting with Bill Haegele so that Mrs. Torre could discuss with him her concerns regarding Trisha's claim. That same day, Mr. Lauritzen and Mrs. Torre drove into Kansas City to meet with Mr. Haegele.[17] At various times thereafter, both Mr. Haegele and Mr. Lauritzen attempted to obtain information for Mrs. Torre regarding the status of the claim.

28. Ms. Janous sent Laurel Ridge a letter, dated December 28, 1989, regarding Trisha's "anticipated confinement" at Laurel Ridge on January 2, 1990. In her letter, Ms. Janous discussed Federated's decision to allocate initially Trisha's expenses to the Plan's mental/nervous limit. Specifically, she explained as follows: "[a]t the time of the writing of this letter, we have received no written medical reports. Based on information we do have, it does appear we are dealing with a claim to which the $50,000 mental

---

1989, Dr. Kearns telephoned to discuss Menninger's diagnosis and provide ICD9 codes; Federated then began receiving inquiries from the Devereaux Foundation, which she did not believe to be covered because it was licensed as a school not a hospital; following a discussion between Mrs. Torre and Ms. Janous in which Ms. Janous explained Federated's concerns regarding Devereaux, Federated began receiving inquiries from Laurel Ridge; because Federated was unfamiliar with Laurel Ridge. Federated began inquiring about it; she explained she received a fax from Laurel Ridge on December, 21, 1989, from which it appeared Laurel Ridge was a psychiatric hospital.

12. As of December 27, 1989, she believed Federated paid $600 to $700 in benefits.

13. Of the $600 to $700 in benefits paid, none had been allocated to the mental/nervous limit.

14. She explained that, based on information recently received from Laurel Ridge, it appeared

Trisha would need between one and two years of confinement at an estimated cost of $420,000. She also explained that Mrs. Torre was "adamant" that Trisha was being treated for a physical and not a "mental/nervous" condition and, therefore, was unwilling to accept that the $50,000 mental/nervous limit might apply.

15. Mrs. Torre's diary confirms her request for review by a child *psychiatrist*. Plaintiffs' Exhibit 286, entry for 12–27–89.

16. Steve Rohr previously had been her DMM.

17. Following the meeting, Mrs. Torre sent Mr. Lauritzen a letter dated January 15, 1990, in which she wrote as follows: "I appreciate the meeting with you and Bill to discuss the health problems with my daughter. It is a difficult situation and you were both very understanding."

and nervous maximum provided by the policy will be applied." She informed Laurel Ridge that, assuming the maximum applied, the available benefits would be whatever remained of the $50,000.00 limit after Federated had paid Menninger. She asked that Laurel Ridge supply Federated with Trisha's medical reports as "expeditiously" as possible so that Federated could determine, with the help of an independent reviewer, whether any of Trisha's expenses would be allocated to the medical limit. She also provided Laurel Ridge with the Plan's definition of "MENTAL ILLNESS."

29. Trisha was admitted to Laurel Ridge's acute care unit January 3, 1990.

30. On January 5, 1990, after determining that Trisha's claim involved questions beyond the MSG's review capacity, Ms. Trenda contacted the TMF for assistance. The TMF was the peer review organization for the State of Texas. Ms. Trenda had hired the TMF to perform independent reviews in the past. She was familiar with the TMF. During her January 5 conversation with the TMF, she asked the TMF to assist Federated in determining whether Trisha had received and was receiving either medical or psychological/psychiatric treatment.

31. Ms. Janous telephoned Laurel Ridge January 8, 1990, to request it provide Federated with Trisha's medical records; specifically, she requested admitting notes, examination results, and treatment plans, if any. Ms. Janous then telephoned Menninger to attempt, once again, to obtain previously requested records regarding Trisha's stay in November and December of 1989. Federated's Health Claims Department and the MSG also had a conference call on January 8 in which they discussed the need to obtain Trisha's medical information; they also decided to have the TMF perform the medical case management of Trisha's stay at Laurel Ridge.

32. In a letter dated January 8, 1990, although it was still awaiting Trisha's medical records, Federated requested that the TMF assign a psychiatrist to perform concurrent review of Trisha's stay at Laurel Ridge. The letter contained Plan # 501's definition of "MENTAL ILLNESS" and asked that the reviewer answer the following seven questions: (1) whether Trisha's admission was medically necessary; (2) how long would/should she stay; (3) what was the quality of the care delivered; (4) was the diagnosis medical or psychological in nature; (5) was the treatment necessary because of an organic or psychological illness; (6) was the treatment psychological or medical; and (7) were the costs incurred within reasonable and customary limits?

33. On January 9, 1990, the TMF informed Federated that Dr. Wiley Jordan, a child psychiatrist, had been assigned to the case and he would contact Ms. Trenda.

34. Dr. Jordan telephoned Ms. Trenda January 10, 1990. He reported he had reviewed Trisha's case and he thought her condition was organic. Ms. Trenda explained that Federated was having difficulty determining whether to allocate her expenses to the Plan's medical or mental/nervous limit. She asked Dr. Jordan to assist with this determination. She also asked Dr. Jordan to check on the availability of residential care, if he thought such care was appropriate. Dr. Jordan then telephoned Dr. Jerry Tomasovic, a pediatric neurologist who was Trisha's treating physician at Laurel Ridge. Following his conversation with Dr. Tomasovic, and still on January 10, Dr. Jordan telephoned Ms. Trenda to report that Trisha's condition was medical and the care administered by Laurel Ridge was appropriate. He estimated Trisha would remain hospitalized at least until February 5, 1990, and probably would need long-term residential care thereafter. He planned to update his report after speaking with Dr. Tomasovic again January 24, 1990. Following her conversations with Dr. Jordan January 10, 1990, Ms. Trenda passed on his report to her supervisor, Mr. Steinbronn, and Mr. Templer. Mr. Steinbronn and Mr. Templer decided to remove Intracorp from the case because the TMF would be able to provide concurrent review.

35. The TMF prepared a written report, dated January 12, 1990, which summarized Dr. Jordan's review findings. The report answered each of the seven questions Ms. Trenda posed in her January 8, 1990, letter

to the TMF.[18] The report stated that Trisha's problem was medical. It also stated that "[t]reatment is psychological in that behavior modification is the goal...."

36. Mr. Templer sent Ms. Janous a letter, dated January 19, 1990, in which he advised her that based upon review of the latest information from Menninger, along with other medical information in Trisha's Home Office correspondence file, and consideration of the report based on Dr. Jordan's review, Federated would treat all expenses incurred by Trisha as of January 19, 1990, as though they were incurred for "medical evaluation" and not mental/nervous "treatment"; accordingly, Federated would allocate all "to date" expenses to the Plan's medical limit. He instructed Ms. Janous to write Mrs. Torre and inform her of Federated's decision to "give her the benefit of the doubt" and treat all "to date" expenses as if they had been incurred for "evaluation" as opposed to "treatment."

37. As Mr. Templer requested, Ms. Janous wrote Mrs. Torre a letter, dated January 23, 1990, explaining Federated's decision, made "[b]ased on available information at this time,"[19] to treat "to date" expenses as though they had been incurred for medical evaluation. Ms. Janous noted, however, that "[o]nce the evaluation phase of Trisha's care at Laurel Ridge has been completed and a treatment plan has begun, any charges for further psychological testings, evaluations or treatments will be paid under the mental and nervous coverage...." She also advised that Federated would continue to have medical personnel review Trisha's care at Laurel Ridge.

38. On January 26, 1990, Dr. Jordan telephoned the MSG and spoke with Ms. Trenda. Dr. Jordan believed, after discussing again Trisha's case with Dr. Tomasovic, that her treatment clearly was psychological in focus and method. Ms. Trenda then telephoned

Ms. Janous to inform her of Dr. Jordan's conclusion. Ms. Janous wrote Mr. Templer a letter dated January 29, 1990, in which she discussed Dr. Jordan's opinion.

39. Mrs. Torre called Federated January 29, 1990, to inquire about the allocation of post-evaluation benefits. Ms. Janous informed her that Trisha's medical reports were being reviewed and Federated would advise her when the process was complete.

40. The TMF prepared a written report dated January 30, 1990, which summarized Dr. Jordan's findings following his second review. The report repeated his earlier findings and included an additional section headed "1–25–90 Physician consultant findings." In this section, the report related Dr. Jordan's opinion that "[t]he treatment from this point forward is clearly psychological in nature, for psychological problems secondary to birth defects." The report also contained Dr. Jordan's recommendation that continued stay be approved until February 8, 1990, even though he feared that such a stay could exhaust Trisha's lifetime mental/nervous benefits.

41. Dr. Jordan was a forthright and credible witness. At trial he explained that he was not concerned about any financial impact on Federated; however, he was concerned that an extended stay at Laurel Ridge might exhaust Trisha's lifetime limit for mental/nervous treatment while she was still very young.

42. In a letter dated February 1, 1990, Ms. Janous responded to Mrs. Torre's January 29, 1990, inquiry. She explained that as of January 29, 1990, Laurel Ridge began a psychological treatment plan. As a result, Federated would allocate any expense incurred after January 29, 1990, which was related to her confinement at Laurel Ridge, to the Plan's mental/nervous limit.[20] Ms. Janous also indicated Federated understood

---

18. The report also related Dr. Tomasovic's belief that he would be able to make recommendations to Mrs. Torre—regarding the necessity of long-term care—upon Mrs. Torre's expected return to Laurel Ridge February 3, 1990.

19. Ms. Janous described this information as reports from Menninger and Dr. Jordan's review.

She noted that they had not yet received Laurel Ridge's written reports.

20. Federated had decided to allocate all expenses incurred prior to January 29, 1990, to the medical limit.

Trisha would be discharged February 8, 1990.

43. On February 7, 1990, Mrs. Torre telephoned Federated and advised Ms. Janous that Trisha was not being discharged February 8, 1990. Mrs. Torre inquired as to Dr. Jordan's credentials and asked why he did not accept Dr. Tomasovic's invitation to visit the facility and review first hand Trisha's treatment. Mrs. Torre also telephoned the Minnesota Department of Commerce to express her dissatisfaction with Federated's handling of Trisha's claim. She spoke with Mike Mobley. They discussed Minnesota law regarding insurance coverage of emotionally handicapped children; specifically, Mr. Mobley told her Minnesota statutes required insurance companies to pay for the treatment of emotionally handicapped children regardless of any contractual mental/nervous limit. He instructed Mrs. Torre to file a formal complaint.

44. On February 9, 1990, Laurel Ridge faxed to Federated a copy of its "Preliminary Team Plan for Interventions." The plan consisted of the following four sections: (1) "Description of Problem"; (2) "Rationale for Treatment"; (3) "Critical Aspects"; and (4) "Interventions." The plan explained that "Trish needs a combination of *behavioral technology habilitation* and special education, *not* just psychotherapeutic interventions." The plan listed nine "interventions," including medical management, behavioral learning, special education, "[g]eneralization training to adapt newly acquired behaviors to settings outside the acute hospital," skills teaching, psychotherapy, and language therapy.

45. Mr. Templer prepared a memorandum dated February 14, 1990, in which he updated Ms. Janous on recent decisions regarding Trisha's claims. He explained that he visited with Mr. Steinbronn and they jointly decided not to bring in a second independent reviewer; however, they recognized that in the future it could be necessary to request a second reviewer.

46. The TMF prepared a report February 14, 1990, regarding Dr. Jordan's most recent discussion with Dr. Tomasovic. In the report, Dr. Jordan noted that Dr. Toma-

sovic contacted him February 8, 1990, to report that Laurel Ridge was having success altering three of Trisha's target behaviors: inappropriate reactions, agitation of peers, and challenging authority. The report noted that Dr. Jordan informed Dr. Tomasovic of his concern that Trisha might exhaust her entire lifetime mental/nervous limit. Despite these concerns, Dr. Jordan concluded that continued stay was warranted because Trisha was making progress.

47. On February 21, 1990, Federated received a fax from Laurel Ridge consisting of master treatment plan updates, progress notes, and behavior data. A representative from Laurel Ridge also telephoned Federated February 21 to explain that because Trisha's case was so complex, the peer review of her case should be conducted by both a psychologist and a neurologist. That same day, Ms. Janous and Ms. Trenda telephoned the TMF to request that a second physician review the case. Ms. Trenda sent the TMF a letter dated February 22, 1990, in which she confirmed Federated's earlier request that Trisha's claim be reviewed by a second independent physician. Federated did not limit its request to a particular type of physician as it had done in its initial letter to the TMF. It is noteworthy that Federated's initial letter to the TMF, dated January 8, 1990, in which it requested that the TMF assign a psychiatrist to review Trisha's case, was written shortly after Mrs. Torre suggested that Federated assign a child *psychiatrist* to review the case.

48. In a letter dated March 2, 1990, the Minnesota Department of Commerce informed Mrs. Torre that because her contract was written in Kansas, Minnesota had no jurisdiction over her complaint. The letter advised her to file a complaint with the Kansas Insurance Commissioner. She did.

49. Ms. Trenda spoke with the TMF on March 6, 1990. She stressed that Federated needed recommendations regarding the allocation of expenses between the medical and mental/nervous limits. Shortly thereafter, the TMF provided its fourth review of Trisha's case. In that review, the new physician, who also was a psychiatrist, recom-

mended three more weeks of continued stay and advised that the treatment plan included medications and psychological methods (milieu, speech therapy, and behavioral modifications programs). In short, the new physician concurred with Dr. Jordan's earlier conclusion that Laurel Ridge was providing psychological treatment for an organic condition.

50. Laurel Ridge sent Federated a letter dated April 17, 1990, which stated that Laurel Ridge believed Trisha's expenses should be allocated to the medical limit. The letter explained that Trisha's primary diagnosis was neurologically based and her primary physician was a pediatric neurologist. Laurel Ridge requested that Federated hire a pediatric neurologist, rather than a psychiatrist, to review Trisha's case. In the letter, Laurel Ridge also indicated that it considered Federated's failure to hire a pediatric neurologist to have been "a major hindrance to the understanding of this case . . . ." Laurel Ridge also noted, however, that "[t]he treatment team at Laurel Ridge appreciates Federated's attempts at understanding this complex case . . . ."

51. Laurel Ridge discharged Trisha April 22, 1990. Dr. Tomasovic did not believe there was any danger involved in discharging Trisha at this time. Indeed, he explained that, regardless of her ability to pay, he would not have discharged her if he thought it unsafe. He referred her to the Davison School, a facility located in Atlanta, Georgia. He believed Davison was capable of continuing the progress begun at Laurel Ridge.

52. Over the course of Trisha's stay at Laurel Ridge, there was much confusion as to when Trisha would be discharged. At her admission on January 3, 1990, Laurel Ridge estimated she would be discharged within 90 to 180 days (ultimately, she was discharged after 108 days). During her evaluation and treatment, however, Laurel Ridge's estimates frequently changed. For example, Dr. Tomasovic's reports show that the estimated discharge date varied from February 8 to February 22, March 27, April 22, and June 3.

53. Dr. Tomasovic was responsible for determining Trisha's discharge date. And, ultimately, he was the individual who decided to discharge Trisha. Neither Federated nor the TMF determined the date of her discharge. Furthermore, neither Federated nor the TMF pressured Dr. Tomasovic to discharge Trisha. On several occasions, representatives of Federated or Dr. Jordan discussed with personnel at Laurel Ridge the $50,000 mental/nervous limit and the possibility Trisha's treatment could result in her exhausting her remaining resources under that limit. However, after reviewing all the exhibits, and assessing the credibility of the relevant witnesses' testimony, the court is convinced these discussions were meant only to inform and not to coerce. To the extent Federated or the independent reviewers discussed with Laurel Ridge allocation issues, or that Trisha was exhausting her lifetime mental/nervous limit, they acted reasonably and responsibly. In short, although financial considerations clearly were involved in Trisha's discharge (she rapidly was depleting the $50,000 available under the mental/nervous limit), the court finds that neither Federated nor the reviewers acted in appropriately in disclosing that Trisha's treatment expenses had been allocated to her lifetime mental/nervous limit which rapidly was being exhausted.

54. Following Trisha's discharge from Laurel Ridge, Mrs. Torre enrolled her in the Davison School in Atlanta, Georgia. Dr. Tomasovic recommended she attend the Davison School because he thought it could provide the type of therapy Trisha received at Laurel Ridge.

55. Mr. Templer sent Laurel Ridge a letter dated April 24, 1990, in which he acknowledged receipt of its April 17, 1990, letter. He explained that Federated had been monitoring closely Trisha's care. He further explained that Federated intended to continue to review her case with respect to the coverage provided by the Plan—that is, Federated would continue to review the disputed allocation issues. Mr. Templer sent this letter to Ms. Trenda along with an additional note requesting that Ms. Trenda determine whether it would be possible to have a pediatric neurologist review Trisha's case. On April 26, 1990, Ms. Trenda telephoned Ms. Janous to report that the TMF did not have a pediatric neurologist on staff.

56. Mr. Templer sent Laurel Ridge a "follow-up" letter dated April 26, 1990. In this letter he explained he understood Trisha's underlying condition was medical, but since he also understood the treatment of that condition to have been psychological, Federated would allocate treatment expenses to the Plan's mental/nervous limit.

57. Mr. Steve O'Neil, a representative of the Kansas Insurance Department, sent Federated a letter, dated April 27, 1990, in which he asked whether a pediatric neurologist had reviewed the case. In its response, Federated explained that it had not yet hired a pediatric neurologist because it believed such a specialist would elaborate only on the neurological cause of Trisha's problems; not what it understood to be the psychological treatment used to address her medical condition.

58. Federated's benefits guide, a copy of which was given to Mrs. Torre, discussed the procedures for filing medical benefits claims. Under the procedures outlined in the guide, an insured was allowed to file a formal appeal of an adverse benefits decision. On May 20, 1990, Mrs. Torre requested a formal review of her claim; specifically, she requested that Federated reverse its prior decisions and allocate all treatment expenses under the Plan's medical limit. She also requested review by a pediatric neurologist.

59. Mr. O'Neil sent Federated a letter dated May 24, 1990, in which he encouraged Federated to procure review by a pediatric neurologist.

60. Ms. Janous sent Mr. Templer a memorandum, dated June 1, 1990, in which she informed him that Mrs. Torre had filed a formal request for review of her claim. Ms. Janous also informed him that Mrs. Torre specifically requested review by a pediatric neurologist. Ms. Janous noted that Federated had considered additional review by a pediatric neurologist, but the TMF did not have such a specialist on staff. She asked for Mr. Templer's advice about how she should handle Mrs. Torre's request for review by a pediatric neurologist.

61. On June 4, 1990, Mr. Templer directed Ms. Janous to contact the MSG, Mr. Steinbronn, and Ms. Trenda and request they have a pediatric neurologist review the claim.

62. Ms. Trenda wrote a letter dated June 5, 1990, to the Medical Review Institute of America in which she requested review by a pediatric neurologist; however, the Medical Review Institute of America was unable to provide such a specialist.

63. In a letter dated June 6, 1990, Ms. Abbe, a Federated Health Benefits Specialist, acknowledged Mrs. Torre's May 20, 1990, request for review and informed her of Federated's decision to obtain an additional review by a pediatric neurologist.

64. The Davison School began to send Federated billing statements requesting payment for services rendered. Ms. Janous sent the Davison School a letter dated June 20, 1990, in which she acknowledged receipt of a billing statement related to speech and language therapy rendered by Susan Smith, the Director of the Davison School. On the same day, Ms. Janous sent the Davison School a letter requesting information about Trisha's treating physician at Davison, whether Trisha was receiving therapy by referral, what the medical diagnosis was of the condition for which the therapy was given, and the expected duration of the therapy.

65. At some time in June 1990, the TMF finally obtained a pediatric neurologist. After learning that the TMF had located a pediatric neurologist, Ms. Trenda sent the TMF a letter dated June 28, 1990, in which she described the issues the neurologist was to examine.

66. The pediatric neurologist was the third independent consultant hired to review Trisha's case.

67. Mr. Templer sent Ms. Janous a memorandum dated July 19, 1990, in which he instructed her not to pay certain bills sent by the Davison School for speech and language therapy. He explained that until Federated received the pediatric neurologist's review, the speech and language therapy would be considered psychological treatment for a physical condition. He decided to pay for Trisha's treatment at Davison—specifically,

her speech and language therapy—on the same basis as Laurel Ridge.

68. The TMF prepared a report dated July 27, 1990, containing the neurologist's conclusion that Trisha's treatment at Laurel Ridge was medical. This report was the fifth the TMF prepared for Federated.

69. Following receipt of the July 27, 1990, report, Mr. Templer instructed Ms. Janous and Ms. Trenda to review the bills in Trisha's file. Pursuant to his request, Ms. Janous and Ms. Trenda reviewed all of Trisha's bills and recommended reallocation. Mr. Templer approved their recommendation and expenses previously allocated to the mental/nervous limit were reallocated to the medical limit.

70. Plan # 501 does not cover educational expenses. The Plan's definition of "NECESSARY CARE AND TREATMENT OF AN INJURY OR A SICKNESS" states that, in order to be considered necessary (payable), the "care or treatment" or "services or supplies" provided "must not be for the scholastic education or vocational training of the patient." The Plan again addresses "education" in the section listing "EXPENSES NOT COVERED." This section provides that "[c]overed expenses will not include, and no payment will be made for, expenses incurred: ... 14. for or in connection with Custodial Care, education or training."

71. John Cummings, Federated's Senior Health Claims Manager, was involved with Federated's coverage decisions regarding the Davison School. He gathered information about the Davison School to determine whether Trisha was receiving primarily medical treatment or educational training and custodial care.[21] From this information, he determined that, with the exception of speech and language therapy,[22] and miscellaneous other medical expenses, Davison was providing primarily educational and custodial services.

72. One of the items upon which Federated based its coverage decision was an informational packet prepared by the Davison School. Four sections of the packet are in the record: (1) "Scope of Services"; (2) "Residential Program"; (3) "Outpatient Clinic"; and (4) "Admission Procedures and Costs." In the packet, the Davison School briefly outlined the services it provided to its students. Davison described itself as a "residential and day school designed to meet the needs of children with language, speech, hearing and learning disorders." Davison explained as follows:

The school is committed to helping these children achieve the communication skills—both spoken and written—that are needed to function in our highly verbal society. Language development is the major thrust of our program: our language-based approach serves as the key that unlocks the capacity for learning.

Our staff of special education professionals teaches small groups of children a full range of academic subjects. Each child receives additional one-on-one speech and language therapy. The student body is kept small—from 60 to 90 students—to assure the highest quality of education and professional attention.

During the course of the school day—8:30 a.m. to 3:30 p.m.—each student follows a learning program individually tailored to his or her abilities.

It also explained that one-half of Davison's students lived "on the school's campus." The on-campus living areas were closed for Christmas, spring, and summer breaks.

73. The Davison School sent Mrs. Torre a statement, dated October 23, 1990, of Trisha's "tuition" and "activity fees" for the 1989–1990 and 1990–1991 school years.

74. Mr. Cummings sent Mrs. Torre's attorneys a letter, dated November 20, 1990, in which he wrote that Federated would not pay for Trisha's tuition and activity fee because

---

21. There is no evidence that the Davison School was licensed as a hospital; however, it was accredited to provide professional services in speech and language pathology by the Professional Services Board of the American Speech–Language–Hearing Association.

22. After receiving the pediatric neurologist's review, Federated paid all of the Davison School's bills for speech and language therapy under the Plan's medical limit.

the Plan did not cover expenses incurred for educational services or custodial care. He noted, however, that Federated would continue to allocate the costs of her speech and language therapy under the Plan's medical limit.

75. As of May 15, 1993, Federated paid a total of $121,323.58 in expenses related to Trisha's care. Of the $121,323.58, Federated allocated $114,874.60 to the Plan's medical limit and $6,448.98 to the mental/nervous limit. These payments covered all expenses incurred at the Menninger Foundation in Topeka, Kansas, all expenses incurred at the Laurel Ridge Hospital in San Antonio, Texas, and all speech and language therapy expenses incurred at the Davison School in Atlanta, Georgia. The only expenses Federated has not paid are the expenses for tuition and residential room and board at the Davison School.

76. Gary Utoft is a Group Underwriting Technical Specialist with Federated. Part of his job is to set rates for Plan # 501. He testified at trial. He was knowledgeable and credible. He explained the manner in which Federated administers the Plan. Plan # 501 is a "true insurance" plan in the sense that risk is spread among all participants: it is not "experience-rated." When he determines the policy rate, he includes only the first $75,000 of any claim. Amounts in excess of $75,000 are considered catastrophic and not an accurate predictor of overall future claims. The "excess" is pooled and all participants are charged the same rate. No single participant is penalized for presenting a big claim. When he sets rates for the Plan, he tries to come up with a loss less than 100 percent. Because in this particular instance Federated acts as both insurer and employer, his goal is to set a rate at which the company breaks even. The rate he sets does not include a profit margin; the Plan is not administered for profit.

77. Mr. Templer has no budget for payment of claims under Plan # 501. He is unaware of the dollar amount of claims paid under the Plan; furthermore, his job performance is unrelated to the dollar amount of claims paid out under the Plan.

78. Federated handled Trisha's claim reasonably and responsibly. The company maintained continuous contact with Mrs. Torre, the health care professionals and facilities providing care to Trisha, and the independent reviewers. Trisha's claim clearly presented complicated questions which Federated attempted to answer fairly; indeed, Federated consistently reexamined its settled decisions to make sure it arrived at the correct conclusion. It also demonstrated a willingness to resolve close questions in favor of coverage (for example, Federated's decision to treat all expenses incurred up to January 29, 1990, as though they had been incurred solely for medical evaluation). There is no persuasive, credible evidence that suggests any Federated decision maker was influenced by the possibility that Trisha's claim would cost Federated too much money. At no time did any Federated supervisor or manager exert pressure on any Federated employee, or independent reviewer, to deny Trisha's claim because of financial considerations. In short, Federated (1) proved that its interpretation of plan provisions committed to its discretion was not tainted by self-interest, (2) established that its factual determinations were not tainted by self-interest, and (3) demonstrated that it operated exclusively in the interests of Plan # 501 participants and beneficiaries. Federated has carried its burden and purged the taint of self-interest.

### D. Employment Discrimination: Title VII and ERISA

79. In 1973 Mrs. Torre earned a Master of Science Degree in Counseling and Personnel from Emporia State University, Emporia, Kansas. She then took a job with Prudential Insurance. She left Prudential in 1974. From 1975 to 1977, she was a Career Counselor at Independence Community College, Independence, Kansas. After leaving the business work place in 1977, she returned in 1982 to serve as Personnel Manager and Assistant to the President of Cornbelt Chemical Company. She remained at Cornbelt until 1984. In 1985 she became Director of Personnel, Payroll, and Employee Relations at Emporia State University.

80. In 1987 while still at Emporia State University, she contacted Federated to inquire about an advertisement inviting applications for an open MR position.

81. She was interested because she thought she could earn more money as a MR.

82. Prior to being hired, she had several conversations with Steve Rohr about the opening; she also met twice with Mr. Haegele. During a conversation with Mr. Rohr in September 1987, she told him that her daughter was hyperactive with some learning disabilities. Mr. Rohr did not react negatively. He assured her that her daughter's medical condition would not be a problem. She discussed Federated's health insurance benefits with Mr. Rohr in October 1988, at which time he gave her a copy of the benefits guide. At one of her interview-type meetings with Mr. Haegele, Mrs. Torre informed him of her interest in advancing within the company.

83. On February 10, 1988, Mrs. Torre signed a contract to become a MR.[23] She was a "street-hire." In addition to "street-hires," Federated also recruited individuals who came straight from college and had no previous job experience. These individuals were then sent to Owatonna for a one year training program. "Street-hires" did not receive the one year program because, unlike their recently graduated counterparts, they already had job experience.

84. In February 1988, Steve Rohr was Mrs. Torre's DMM and Bill Haegele was her RMM. In December 1989, Thomas Lauritzen replaced Mr. Rohr as Mrs. Torre's DMM. Each of these three men readily admitted that Mrs. Torre was an able and productive MR. Indeed, she frequently received awards based on her productivity. There is no dispute that she was a successful employee and promotable.

85. Federated does not have a written policy regarding promotions and transfers. Nor does Federated list or post notices of openings or opportunities. Federated maintains an informal practice whereby DMMs and RMMs have the responsibility to review the performance of their subordinates to identify individuals they consider to be promotable. Generally, as matter of practice and convenience, RMMs promote from within their own regions. RMMS have the authority to promote only to DMM within their own region—that is, they have not the authority to promote to positions outside of their own region. However, if a RMM has a MR who is interested in positions other than DMM, the RMM may inform his superiors. Where a MR indicates an interest in a position outside the RMM's region, the RMM does not contact directly another RMM with the MR's request, but, instead, he relays the MR's interest to the Director of Field Operations.

86. If a DMM identifies an individual he believes may be promotable, he notifies his RMM. If the RMM concurs with the DMM's recommendation, a management appraisal[24] is prepared and submitted to the Director of Field Operations.[25] The Director of Field Operations reviews the appraisal and decides whether to send it on to the Director of Marketing for further review. Ultimately, if found acceptable, the management appraisal serves as the impetus for a formal career assessment (also called a career review). The Human Resources Department is responsible for arranging a career assessment of the candidate in Owatonna. The career assessment is a prerequisite of promotion.

87. An individual MR who is interested in promotion may initiate the process on his or her own by contacting his or her DMM or RMM and expressing an interest in advance-

---

23. Attached to her contract was a "Territory Assignment" form. Federated later sent her a "Correction" to the original assignment. In the jury trial of her breach of contract claim, the court gave the jury a special interrogatory regarding the nature of the "Correction." Specifically, the court asked whether the "Correction" was in response to a clerical error contained in the original assignment. The jury answered "no"; thereby explicitly finding that it was not.

The court adopts the jury's finding as to this question.

24. The management appraisal must be completed before an individual can receive a career review.

25. In addition to a MR's RMM, the Director of Field Operations also has the authority to recommend consideration for promotion.

ment within the company. DMMs and RMMS have no financial incentive to interfere with or hinder the promotion of a promotable subordinate. In fact, they have a financial incentive to hire promotable people.

88. Shortly after hiring Mrs. Torre, Federated sent her to its training center in Owatonna, Minnesota, for three weeks of "basic training." "Basic training" was meant to introduce new "street-hires" to Federated's way of doing business. She was part of a class of 20 people: 5 females and 15 males. During training Federated housed the female trainees in a facility separate from the training center. Mrs. Torre complained to Don Noyce, a trainer in Owatonna, that the females were housed further from the training facility than the males. She also complained to Mr. Noyce about Federated's "40–mile" policy regarding loaned automobiles. Specifically, she was upset that Federated would not relax the rule so she could get a car to travel into Minneapolis–St. Paul for "cultural events" and shopping; she felt Federated was willing to relax the rule when males wanted a car to go to sporting events.

89. Mr. Noyce never informed Mrs. Torre's supervisors that she had complained about the treatment of female trainees.

90. After her training session in Owatonna, she returned to Kansas to service her assigned territory. She later became aware that Federated also had assigned Jeff Richardson to service Topeka, Kansas, a city within her assigned territory.

91. In the fall of 1988, she spoke to Mr. Rohr about opportunities for promotion. He encouraged her and indicated she likely would go to Owatonna the next year for a career assessment. She felt that with this request she had "set the wheels in motion" for promotion.

92. In June 1988, she attended a quarterly meeting. She was the only female present. A MR from Hays, Kansas, circulated photocopies of a photograph of a nude male with a large penis. Attached to the photograph was a notation to the effect that "Mr. Rohr could handle it." Mrs. Torre was offended and complained to Mr. Rohr. Mr. Rohr agreed the photograph was inappropriate and told her he would take care of it. Following her complaint, and Mr. Rohr's assurances to take care of the situation, no more offensive handouts were circulated. Mr. Rohr did not react angrily to her complaint. Nor did he act differently to her after she complained. In fact, he later twice recommended her to Mr. Haegele for the Monthly Leadership Council Award. Mr. Haegele acted on both of Mr. Rohr's recommendations and selected Mrs. Torre for Monthly Leadership Council Awards in October 1988 and October 1989.[26]

93. Jock Kinnett, then Director of Field Operations, wrote Mrs. Torre a letter, dated October 28, 1988, in which he congratulated her for winning the Monthly Leadership Council Award for October 1988. He sent copies of the letter to various other members of Federated's upper management. In his letter, Mr. Kinnett quoted some of the praise which Mr. Rohr gave Mrs. Torre in his letter nominating her for the Award.

94. In May 1989 she wrote Jock Kinnett a letter in which she expressed her interest in pursuing opportunities for promotion. This letter is the first time she notified Federated in writing of her interest in promotion.

**26.** Federated had several different programs to recognize the efforts and achievements of its MRs. The Monthly Leadership Council Award was one such program. Each RMM was permitted to select one of the MRs in his region every month to receive the Monthly Leadership Council Award. The RMM would select the winner from individuals recommended by each DMM in his region. A RMM was not allowed to give the Award to the same MR more than once in any given year. Federated placed a "recognition advertisement" in the newspaper of the winner's headquarter town and sent a press release to the newspaper. Additionally, Federated sent "award announcement cards" to up to 60 persons or businesses which the winner identified as his top prospects.

The following is a partial list of some of the criteria for the Award: (1) total production leadership for the month; (2) production leadership in a particular line; (3) outstanding service to clients; (4) a specific case of outstanding service to a client; and (5) a specific instance or combination of actions that indicate outstanding service to the company.

**1354**

95. Federated conducted an Advanced Marketing Seminar in May, 1989. Mrs. Torre attended.[27] She sent Mr. Kinnett a letter, dated May 24, 1989, in which she wrote that "[o]verall the seminar was positive and I learned many things from talking with other MR's. I continue to be impressed with the quality of and the commitment to training of Federated."

96. In October 1989 Mrs. Torre again won the Monthly Leadership Council Award. Mr. Haegele wrote her a letter dated October 24, 1989, praising her for her achievement. The letter was also sent to various other members of Federated's upper management. In his letter, Mr. Haegele quoted the following passage from Mr. Rohr's nomination letter: "Pam Torre is a 'winner' and I am awfully proud to have her in my district. Her excellent performance month after month lifts the expectations of my entire region."

97. In late 1989 Trisha was admitted to the Menninger Clinic for observation; she remained until December 1989. In December 1989, Mrs. Torre began looking for a new facility for Trisha. Throughout December 1989, and much of 1990, she was in constant contact with Federated regarding coverage questions. In December 1989, Mrs. Torre grew concerned about the problems she perceived she was having regarding Trisha's coverage. She discussed her concerns with Mr. Rohr who suggested she contact Mr. Templer at the Home Office. She did. Mr. Templer then requested Trisha's claim become a Home Office file.

98. In late December 1989 Mr. Lauritzen, who recently had become Mrs. Torre's DMM, drove to her home in Osage City, Kansas, to discuss various concerns he had regarding the Topeka territory. He recommended she open an office in Topeka with Mr. Richardson.[28] He thought this would increase Federated's exposure in Topeka. At trial, Mr. Lauritzen credibly presented and explained his reasons for wanting Mrs. Torre to share an office in Topeka with Mr. Richardson. His reasons were legitimate, nondiscriminatory, and persuasive. Mrs. Torre resisted Mr. Lauritzen's suggestion because she already had an office in her home. During this same meeting, Mrs. Torre told Mr. Lauritzen about the problems she felt she was having regarding Trisha's claim. Mr. Lauritzen was unaware of the claim; however, he was concerned and immediately set up a meeting with Mr. Haegele in Kansas City. Mr. Lauritzen and Mrs. Torre drove to Kansas City the same day and discussed the matter with Mr. Haegele. Mrs. Torre informed the two men that she intended to fight her claim to the end. Mr. Haegele assured her he would look into her concerns. He did. He contacted Lyle Templer to inquire about her concerns and wrote Mr. Kinnett regarding her situation. Throughout the relevant time, Mr. Haegele periodically requested information regarding the progress of her claim. He was unconcerned about the potential amount of the claim; instead, he merely wanted to keep apprised of the situation because it was so important to one of his biggest producers. In one of his letters, he even seemed to

27. The record is unclear as to the exact date, but, apparently during the May 1989, seminar, Mrs. Torre had dinner with Mr. Rohr, his wife, and Mr. Kinnett. During this dinner she discussed with Mr. Kinnett the opportunities for advancement within the company. This discussion appears to have been a "follow-up" on her earlier May 1989, letter to Mr. Kinnett.

28. At this meeting, Mr. Lauritzen brought up a topic that Mrs. Torre and Mr. Richardson previously discussed with Mr. Haegele: a Topeka office. At an earlier meeting in Salina, Kansas, Mrs. Torre and Mr. Richardson discussed with Mr. Haegele the possibility of opening a "cluster office" in Topeka ("cluster offices" are those for which Federated foots the bill). Their conversation with Mr. Haegele about the possibility of opening a "cluster office" is evidenced by Mr. Haegele's March 6, 1989, letter to Mr. Rohr. After Mr. Lauritzen took over for Mr. Rohr in December 1989, he sent Mr. Haegele a memorandum, dated December 20, 1989, discussing the open question regarding the Topeka "cluster office." Mr. Haegele responded with a memorandum dated December 27, 1989, in which he explained that Federated would not pay for a "cluster office" due to recent marketing changes in Kansas. However, Mr. Haegele explained that "the fact that our company won't pay for the cluster office doesn't make it any less necessary. I believe, as Pam and Jeff do, that over the long run, an office of some type in Topeka is necessary."

encourage Mr. Templer to settle the claim in Mrs. Torre's favor.

99. Mrs. Torre wrote a letter dated January 15, 1990, to Mr. Lauritzen; she also sent a copy to Mr. Haegele. In the letter, she wrote that she "appreciate[d] the meeting with [Mr. Lauritzen] and [Mr. Haegele] to discuss the health problems with my daughter. It is a difficult situation and you were both very understanding." She also reminded Mr. Lauritzen that Mr. Rohr told her she would go to Owatonna for a career assessment in the spring and expressed interest in a management position in Phoenix.

100. Mr. Haegele wrote Mr. Kinnett a memorandum dated January 18, 1990. He attached Mrs. Torre's January 15, 1990, letter. In the memorandum, he briefly discussed the status of Trisha's claim and noted Mrs. Torre's interest in a position in Phoenix. However, he also noted that Mrs. Torre "indicated that she could not see herself as a district marketing manager." He wrote that he thought Federated should schedule her for a career assessment but that he felt there was no rush because Mr. Lauritzen had explained to her that nothing would happen until probably 1991. At this time, Mr. Haegele had no openings in his region for DMMs.[29]

101. Mr. Haegele prepared a formal list, dated January 18, 1990, of MRs in his region whom he felt were promotable. He included Mrs. Torre as the fourth ranked prospect on his list. His comments were as follows: "Good long-term candidate. Has expressed an interest in becoming a manager." The list also noted that she, like three of the top five candidates on the list, had not yet received a career assessment.

102. In February 1990 Mrs. Torre again spoke to Mr. Haegele about Trisha's claim; however, Mr. Haegele had no new information for her.

103. Sometime thereafter, either in late February or early March, Mrs. Torre met with Mr. Lauritzen at her home in Osage City. Mr. Lauritzen and Mrs. Torre differ as to the tone of the meeting. Following the meeting, Mrs. Torre wrote Mr. Lauritzen a letter, dated March 5, 1990, in which she discussed her impressions of the meeting and requested reimbursement for expenses related to the opening of the office in Topeka. In her letter, she wrote that she wondered whether Mr. Lauritzen had come to try to force her to quit. After weighing the persuasive, credible evidence, the court finds that Mr. Lauritzen was not sent to push Mrs. Torre to quit.

104. Mr. Lauritzen shared the March 5, 1990, letter with Mr. Haegele. Mr. Haegele wrote Mrs. Torre a letter, dated March 8, 1990, in which he assured her that Trisha's health claim was separate from any performance related issues she may have discussed with Mr. Lauritzen.

105. Mr. Lauritzen nominated Mrs. Torre for the March 1990, Monthly Leadership Council Award; Mr. Haegele selected her. Al Annexstad, Director of Marketing, recognized her as the recipient of the Award in an announcement circulated throughout the company.

106. Mrs. Torre wrote Mr. Lauritzen a letter, dated June 13, 1990, in which she expressed additional concerns regarding the Topeka office, among other things. Mr. Lauritzen replied with a letter dated June 20, 1990. In his letter, Mr. Lauritzen recounted his understanding of the development of the current marketing arrangement and attempted to address and allay her concerns.

107. Near the end of 1990, Federated conducted training sessions at the Hilton Hotel in Wichita, Kansas. Mrs. Torre attended. Following one of the sessions, Mrs. Torre was talking with several other MRs in the hotel bar. Mr. Lauritzen was present. Jerry Bunker, another MR, told Mrs. Torre she should go to a strip bar with them so she could learn a trade for when Federated fired her. Later that evening Mr. Lauritzen and Mrs. Torre had dinner together. They discussed the comment and Mr. Lauritzen

---

29. As a RMM, Mr. Haegele had the authority to promote Mrs. Torre only to a DMM position within his own region. During 1989–1991, only two DMM positions in metropolitan areas opened within Mr. Haegele's region. He filled them with one female, Scottie Scott, and one male, Mr. Lauritzen. Both Ms. Scott and Mr. Lauritzen were "street-hires."

agreed it was inappropriate. She did not ask him to take any particular action. Nor did she write Mr. Haegele or any other member of Federated's management regarding the comment or her concerns.

108. The record is unclear as to the exact date, but apparently at the training session in Wichita, Mr. Lauritzen played a film of a British man defecating. Mrs. Torre testified she was offended; however, she did not complain to anyone. The court finds that, as described by Mrs. Torre, Mr. Lauritzen's playing of the film was not sex-based conduct; but, instead, was conduct that was offensive regardless of sex.

109. In 1990 Federated instituted a sales contest known as the "Big Hitter." MRs who met certain production goals were eligible to win an award which was to be presented at their annual regional kickoff meeting. In addition to recognition in front of peers, supervisors, and members of Federated's upper management, award winners received a Louisville Slugger baseball bat with their names inscribed, baseball card type business calling cards, and company wide recognition in Federated's internal publication, the Multiliner. Apart from providing winners with the calling cards, Federated did not advertise outside the company the results of the contest.

110. Mrs. Torre won a Big Hitter Award for 1990. She received all of the internal recognition and prizes to which she was entitled.

111. As a matter of company policy, during the time relevant here, Federated offered a 12 percent expense reimbursement for MRs who met certain requirements. One of the requirements was that the MR quote 36 pieces of business. Mrs. Torre failed to meet the requirements for 1990; specifically, she failed to quote 36 pieces of business. Nevertheless, following a request from Mrs. Torre, which Mr. Lauritzen supported, Mr. Haegele wrote Paul Peterson a letter dated January 31, 1991, to support Mrs. Torre's application for the reimbursement. One of the reasons Mr. Haegele gave for his support was as

follows: "[t]his has been a difficult year for Pam Torre. She's a single parent, and throughout most of 1990, her only daughter has been hospitalized in two hospitals. One located in Austin, Texas, and the other in Atlanta, Georgia. This has required a tremendous amount of time on her part to fly to and from both locations many times. Had she not had that responsibility, I'm sure she would have quoted at least 45 pieces of business." Despite Mr. Haegele's letter, Mrs. Torre did not receive the reimbursement.

112. Mrs. Torre wrote Mr. Haegele a short note dated February 14, 1991, in which she noted that in early 1990 she sent him a copy of a letter she wrote to Mr. Lauritzen expressing interest in a position in Phoenix. She also reminded Mr. Haegele that they had discussed her interest in Atlanta. She requested feedback as to what her next step should be.

113. Mr. Haegele wrote Jim Leighty, the Director of Field Operations, a letter dated February 18, 1991, in which he discussed Mrs. Torre's continued interest in a management position. He noted that she had a background in human resources and was a successful MR. He requested that Mr. Leighty ask the Human Resources Department to arrange a career assessment for her.

114. In early March 1991, Mr. Haegele asked Mr. Lauritzen to complete a management appraisal form on Mrs. Torre. Mr. Lauritzen complied. He prepared a form dated March 13, 1991, in which he was very complimentary of her abilities as a MR. He wrote, in part, that "I think Pam is well qualified for promotion." Mr. Haegele counter-signed the appraisal form. The form was sent to Mr. Leighty. Mr. Leighty reviewed the form. He returned it because he thought it was too brief. He did not recommend Mrs. Torre receive a career assessment because he never received a satisfactory form. He understood Mrs. Torre had indicated, either personally or through her attorneys, that she would no longer accept a promotion if offered.[30] Mr. Leighty testified that he

---

30. Mr. Haegele testified that Mrs. Torre told him she was not interested in a lateral move. However, he did not recall her ever telling him personally that she was no longer interested in promotion. Indeed, he stated that he continued to

believed Mrs. Torre would be a manager today if she had not expressed an unwillingness to consider any offers of promotion.

115. In April 1991, Mr. Richardson received the Monthly Leadership Council Award. The Marketing Administration Manual lists the factors which the RMM is to consider when deciding whom to select for the Monthly Leadership Council Award; among the factors listed is "[a] specific case of outstanding service to a client." Mr. Lauritzen nominated Mr. Richardson instead of Mrs. Torre because Mr. Lauritzen felt Mr. Richardson delivered particularly good service to a Federated client that month. Mr. Haegele accepted Mr. Lauritzen's recommendation also because he felt Mr. Richardson delivered particularly good service that month. There is no evidence that Mr. Richardson did not.

116. On May 23, 1991, Mrs. Torre filed sex discrimination complaints with both the Kansas Commission on Civil Rights ("KCCR") and the Equal Employment Opportunity Commission ("EEOC").

117. Mrs. Torre qualified for the "Big Hitter" Award in 1991. She was the only MR in Mr. Haegele's Region who qualified for the award; whereas, in the past, Mr. Haegele had had 10–15 winners in his Region. Mr. Haegele did not present her with the award at the 1991 kickoff meeting. The kickoff meeting was a motivational meeting held prior to the beginning of each year. Mr. Haegele explained that he did not present her with the award at the meeting because he felt it would undermine the purpose of the meeting: to create excitement among his DMMs and MRs and generate momentum for the coming year. He felt that the award symbolized a failure, both personally and within the Region, because only one individual out of all of his MRs was successful enough to earn it.

118. As with all kickoff meetings, attendance at the 1991 meeting was mandatory for MRs and DMMs. During the meeting various MRs congratulated Mrs. Torre for earning the "Big Hitter" Award. Some asked why Mr. Haegele had not presented her with

consider her for promotion up to the time she

the award in front of the group. Various members of Federated's upper management also attended—such as, Al Annexstad, Director of Marketing, and Mr. Leighty, Director Field Operations. Both Mr. Annexstad and Mr. Leighty knew Mrs. Torre earned the "Big Hitter" Award. Mr. Leighty chastised Mr. Haegele for not presenting her with the award at the meeting. Mr. Lauritzen also confronted Mr. Haegele and told him he should have given Mrs. Torre the award at the meeting. At trial, Mr. Haegele admitted he made a mistake by not presenting the award to Mrs. Torre at the meeting.

119. Following the meeting, Mr. Haegele instructed Mr. Lauritzen to take Mrs. Torre the inscribed baseball bat. He did. Mrs. Torre also was recognized as a recipient of the "Big Hitter" Award in company publications which went to all upper management.

120. As previously noted, Mrs. Torre filed complaints of sex discrimination with both the KCCR and the EEOC. Federated's Corporate Counsel, Debra Remine, sent a letter dated June 18, 1991, to the KCCR responding to Mrs. Torre's complaint. In the letter Ms. Remine wrote that "Mrs. Torre is in line for a career assessment by Federated, as a result of her March 1991 management appraisal." She explained that "[s]uch reviews are very costly and are offered on a limited basis, even to qualified employees." She further explained that "Federated did not offer the career assessment to Mrs. Torre on May 17, 1991, as we had intended, as her attorneys were very quick to reject any position we might take."

121. Mr. Haegele prepared two lists dated September 13, 1991, of his promotable MRs. On one list, entitled "DMM Candidates," Mrs. Torre is ranked first. Mr. Haegele wrote by her entry as follows: "Management appraisal form completed 3/14/91. Recommended for promotion DMM candidate." On the other list, entitled "Other Marketing Position Candidates," Mrs. Torre is ranked second. Mr. Haegele wrote by her entry as follows: "In addition to being well-

went on disability.

suited for DMM, Pam is also qualified, in my opinion, for service company representative."

122. In 1991 and 1992, the insurance industry in Kansas was very competitive. Federated's competitors, such as Farmland Industries, were attempting to increase their market share by decreasing their rates.[31] As a result, Mrs. Torre, as well as other MRs, began to lose some of their accounts to lower priced competitors. Throughout 1991 and 1992, Mrs. Torre wrote Federated to complain about losing business to lower priced competitors. She believed that she was losing business because Federated intentionally was providing her with unreasonable, uncompetitive quotes. Mrs. Torre testified that she believed Federated singled her out and provided her with unreasonably high quotes. The greater weight of the persuasive, credible evidence does not support her claims. In fact, her claims are most entirely based on her unsupported speculation.

123. During the relevant time, June Van Hoff was an underwriter responsible for the six MRs in Kansas; Mrs. Torre was one of the six. Ms. Van Hoff was knowledgeable and credible. She explained how she arrived at the prices given to the MRs to quote to the customers and she explained the procedures regarding discretionary credit.[32] She worked with Mrs. Torre from May 1989, to April 1992. Mrs. Torre complained about the quotes she received, as did other MRs. Ms. Van Hoff does not recall Mrs. Torre complaining more than the other MRs with whom she worked. Ms. Van Hoff was not pressured by anyone at Federated to single Mrs. Torre out and provide her with unreasonable, uncompetitive quotes. Ms. Van Hoff did not treat Mrs. Torre differently than the other MRs with whom she worked.

124. During the relevant time, John Kriesel worked in the underwriting department as the Manager in charge of Kansas. Ms. Van Hoff worked under a supervisor who, in turn, worked under Mr. Kriesel. Mr. Kriesel was knowledgeable and credible.

125. The court finds that Federated persuasively explained the challenged quotes in terms of the competitive environment within Kansas at the time and the various potential customers' loss histories, financial status, and other relevant business factors (such as, failure to comply with Federated's loss control recommendations). Mrs. Torre fails to rebut Federated's explanations; instead, she relies on her own speculation and surmise. This is insufficient. The court finds that the greater weight of the evidence convincingly establishes that Federated did not deliberately provide Mrs. Torre with unreasonably high quotes in a conscious effort to drive away current and potential customers. Moreover, Federated provided her with discretionary credit on a basis similar to other MRs in Kansas. Specifically, when compared to that given to other MRs, the discretionary credit given to Mrs. Torre was average to better than average. In short, she was not treated differently than similarly situated MRs.

126. On March 30, 1992, Mrs. Torre applied for short-term disability status. Federated granted her application and provided her with short-term benefits. On October 1, 1992, she qualified for long-term disability benefits. At the time of trial, Federated was

---

**31.** Federated is not a "low bidder." Instead, it operates as a "value-added" insurance company. Essentially, this means that Federated focuses much of its competitive energy to providing increased services to the customer, as opposed to decreased rates.

**32.** To sell a customer a policy, the MR first has to obtain a "quote" from Federated's underwriting department. The first step is for the MR to fill out a "right report" on the customer. The "right report" provides a picture of the risk. The MR then submits the "right report" to the underwriting department. The underwriting department studies the risk profile and arrives at a "rating." The underwriting department then compares the "rating" to a corresponding price list which Federated files with the state of Kansas. The underwriting department is allowed to adjust the rate filed with the state by 25 percent in either direction—that is, they can increase or decrease the filed rate by 25 percent. Whether a MR receives a "discretionary credit" is determined by the underwriting department with the assistance of a "discretionary credit" worksheet. The decision is customer-specific in that the underwriting department must evaluate business risk of that particular customer in terms of its potential for loss. Once the underwriting department has made the evaluation, the price is computed. The MR is given this price which she may then quote the customer.

providing Mrs. Torre with long-term disability benefits.

127. At no time did any Federated employee pressure Mr. Haegele to treat Mrs. Torre differently because of Trisha's health benefits claim. He did not treat her differently because of Trisha's claim. Furthermore, at no time did Mr. Haegele or any other Federated employee pressure Mr. Lauritzen to treat Mrs. Torre differently because of Trisha's health benefits claim. Mr. Lauritzen did not treat her differently because of Trisha's claim. Neither Mr. Haegele nor Mr. Lauritzen withheld any financial opportunity, recognition, promotion, or transfer because of Trisha's health benefits claim. In short, the greater weight of the persuasive, credible evidence establishes that no relevant Federated employee discriminated against Mrs. Torre because of Trisha's claim.

128. Mrs. Torre submitted various documents intended to demonstrate a statistical disparity in Federated's promotions and, apparently, also to show Federated promoted males to positions for which Mrs. Torre was a better suited candidate. Her evidence is incomplete and unexplained. It shows only that during her tenure, Federated promoted male MRs to certain positions within the company's various geographic regions. A fair reading of this evidence supports neither the conclusion that Federated unlawfully excluded its qualified female MRs from advancement within the company nor that Mrs. Torre was unlawfully excluded from positions for which she was qualified and had expressed an interest. In short, the court finds this evidence unpersuasive.

129. It is undisputed that Mr. Richardson and Mrs. Torre split equally the expenses related to their maintenance of their joint Topeka office.

130. After examining the record, and weighing the persuasive, credible evidence, the court finds as follows: (1) Mrs. Torre's complaints regarding the different treatment accorded males and females at Federated's training facility did not affect her position at Federated; (2) her complaints regarding various types of offensive behaviors at Federated company functions (specifically, the film, the photo, and the comment) did not affect

her position at Federated; and (3) her formal discrimination complaints filed May 23, 1991, did not affect her position at Federated. As to the first and second listed items, the court specifically finds that the evidence provides no reasonable basis for tying these isolated incidents to the actions she challenges.

## III. CONCLUSIONS OF LAW

As previously noted, Mrs. Torre alleges violations of both ERISA and Title VII. The court has federal question jurisdiction. 28 U.S.C. § 1331.

### A. ERISA

1. Mrs. Torre presents the following two claims: (a) a 29 U.S.C. § 1132(a)(1)(B) claim to recover health benefits allegedly due under the terms of Plan # 501 ("benefits claim"); and (b) a 29 U.S.C. § 1140 claim for unlawful employment discrimination ("discrimination claim"). The court addresses each claim separately.

#### a) *Benefits claim*

2. Mrs. Torre's first ERISA claim is for benefits allegedly due under the Plan. Section 1132(a)(1)(B), Title 29, United States Code, enables a plan participant or beneficiary to bring a civil action "to recover benefits due to [her] under the terms of [her] plan, to enforce [her] rights under the terms of the plan, or to clarify [her] rights to future benefits under the terms of the plan." Mrs. Torre's benefits claim requires the court to determine whether Federated permissibly denied her requests for coverage. The first step in this determination is to find the proper standard under which to review Federated's actions.

3. Section 1132(a)(1)(B) provides for the review of a denial of benefits allegedly due under a welfare benefit plan; however, it does not set forth the appropriate standard. *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 109, 109 S.Ct. 948, 953, 103 L.Ed.2d 80 (1989). In *Firestone Tire & Rubber Co. v. Bruch,* the Supreme Court looked to principles of trust law to determine the standard. *Id.* at 111, 109 S.Ct. at 954–55. The Court held that "a denial of benefits

challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id.* at 115, 109 S.Ct. at 956–57. If the plan gives discretionary authority, review is under the arbitrary and capricious standard. *Winchester v. Prudential Life Ins. Co. of America*, 975 F.2d 1479, 1483 (10th Cir.1992); *Woolsey v. Marion Laboratories, Inc.*, 934 F.2d 1452, 1457 (10th Cir.1991). *See also Sandoval v. Aetna Life and Cas. Insurance Co.*, 967 F.2d 377, 380 (10th Cir.1992) (citing *Bruch* for the same proposition).

4. Mrs. Torre argues that Federated has a conflict of interest and, therefore, the court must apply the *de novo* standard. The court does not read *Bruch* as supporting plaintiff's argument. According to *Bruch*, the court's first inquiry is whether the plan documents provide the administrator with discretion. If the documents provide no discretion, the inquiry is over and the standard is *de novo*. *Bruch*, 489 U.S. at 115, 109 S.Ct. at 956–57. On the other hand, if the documents provide discretion, review is by the arbitrary and capricious standard. A conflict of interest is relevant only if the documents provide discretion. *See Id.* (noting that the *de novo* standard applies regardless of whether the administrator has a conflict). Where there is both discretion and a conflict of interest, *Bruch* instructs that "the conflict must be weighed as a facto[r] in determining whether there is an abuse of discretion." *Id.* (internal quotations omitted).

■ 5. Accordingly, the first question is whether Federated, as the designated Administrator of Plan # 501, had the requisite discretionary authority. *Bass v. Prudential Ins. Co. of America*, 764 F.Supp. 1436, 1439 (D.Kan.1991). In the Memorandum and Order issued May 31, 1994, the court examined the relevant plan documents and concluded that Federated possessed the requisite discretionary authority. *Torre v. Federated Mut. Ins. Co.*, 854 F.Supp. 790, 813 (D.Kan. 1994).

■ 6. Since the documents confer the necessary discretion, Federated argues that

the court must apply the arbitrary and capricious standard. Under this standard, an interpretation ordinarily will be upheld if it is reasonable and made in good faith. *Rademacher v. Colo. Ass'n of Soil Cons. Districts Med. Plan*, 11 F.3d 1567, 1569 (10th Cir. 1993). However, where the administrator is operating under a conflict of interest, the standard is less deferential. *Pitman v. Blue Cross and Blue Shield*, 24 F.3d 118, 122–24 (10th Cir.1994); *Doe v. Group Hospitalization & Medical Services*, 3 F.3d 80, 87 (4th Cir.1993); *Brown v. Blue Cross & Blue Shield of Alabama*, 898 F.2d 1556, 1566–67 (11th Cir.1990), *cert. denied*, 498 U.S. 1040, 111 S.Ct. 712, 112 L.Ed.2d 701 (1991); *Bass*, 764 F.Supp. at 1440.

7. In *Bass v. Prudential Ins. Co. of America*, Judge O'Connor discussed the standard to be applied when the administrator also issued the policy which it administers. He explained that "[w]hen an insurance company serves as an ERISA fiduciary to a plan composed of a policy issued by that company, it 'is exercising discretion over a situation for which it incurs 'direct, immediate expense as a result of benefit determinations favorable to the [p]lan participants.'"" *Bass*, 764 F.Supp. at 1440 (quoting *Brown*, 898 F.2d at 1561–62 (quoting *de Nobel v. Vitro Corp.*, 885 F.2d 1180, 1191 (4th Cir. 1989))). He concluded, therefore, that "'a strong conflict of interests [exists] when the fiduciary making a discretionary decision is also the insurance company responsible for paying the claims.'" *Id.* (quoting *Anderson v. Blue Cross/Blue Shield of Alabama*, 907 F.2d 1072, 1076 (11th Cir.1990)).

8. Because of the conflict, Judge O'Connor applied the heightened review adopted by the Eleventh Circuit in *Brown v. Blue Cross & Blue Shield of Alabama*, 898 F.2d at 1566–67. The *Brown* formulation is as follows:

when a plan beneficiary demonstrates a substantial conflict of interest on the part of the fiduciary responsible for benefits determinations, the burden shifts to the fiduciary to prove that its interpretation of plan provisions committed to its discretion was not tainted by self-interest. That is, a

wrong but apparently reasonable interpretation is arbitrary and capricious if it advances the conflicting interest of the fiduciary at the expense of the affected beneficiary or beneficiaries unless the fiduciary justifies the interpretation on the ground of its benefit to the class of all participants and beneficiaries.

*Id.*

9. Federated is designated as the ERISA Administrator of Plan # 501. Federated also issued the policy designated as Plan # 501. Thus, on the surface, a conflict appears to exist. Although it is clear that any conflict must be weighed as a factor in determining whether Federated abused its discretion, *see Bruch,* 489 U.S. at 115, 109 S.Ct. at 956–57, the Tenth Circuit has not articulated a precise test.[33] As Judge O'Connor did in *Bass,* the court looks to the Eleventh Circuit for guidance. The court finds instructive the following passage from *Brown:*

a fiduciary operating under a conflict of interest may be entitled to review by the arbitrary and capricious standard for its discretionary decisions as provided in the ERISA plan documents, but the degree of deference actually exercised in application of the standard will be significantly diminished. A court should not exercise de novo review, but the area of discretion to which deference is paid must be confined narrowly to decisions for which a conflicted fiduciary can demonstrate that it is operating exclusively for the interests of the plan participants and beneficiaries. Even a conflicted fiduciary should receive deference when it demonstrates that it is exercising discretion among choices which reasonably may be considered to be in the interests of the participants and beneficiaries. The fiduciary, however, should bear the burden of dispelling the notion that its conflict of interest has tainted its judgment. If the fiduciary carries this burden, the party challenging its action may still

succeed if the action is arbitrary and capricious by other measures.
*Brown,* 898 F.2d at 1568.

10. Mrs. Torre challenges the following three actions or series of actions: (1) Federated's determination that Trisha's treatment at Laurel Ridge was psychological; (2) Federated's determination that the tuition and fees charged by the Davison School were for educational services and, therefore, excludable; and (3) Federated's failure actively to assist in Mrs. Torre's selection of a residential treatment facility for Trisha. The first and second challenged actions primarily involve benefit determinations; the third challenged action involves only plan interpretation.

11. Mrs. Torre's first benefits claim is that Federated incorrectly allocated expenses from Laurel Ridge to the Plan's $50,000 mental/nervous limit. She argues Federated's misallocation caused Laurel Ridge to discharge Trisha prematurely.

12. Plan # 501 provides, in part, as follows: "[i]f an Employee or a Dependent, while insured for these Benefits, incurs Covered Expenses, We will pay an amount as provided in the Schedule. Payment of any Benefits will be subject to the Maximum Benefit Provision and to the Mental Illness Maximum." The Plan's two maxima establish the following lifetime benefits limits: (1) a $1,000,000 limit on medical expenses and (2) a $50,000 limit on mental/nervous expenses. Expenses attributed to medical treatment reduce the available medical limit; expenses attributed to the treatment of a mental illness reduce the available mental/nervous limit. The Plan defines "mental illness" as "any mental disorder or functional nervous disorder and includes psychiatric or psychological treatment of any physical condition."

12. Mrs. Torre does not argue that the Plan's definition of "mental illness" is ambiguous. Instead, she challenges Federated's decision to allocate all treatment expenses incurred after January 29, 1990, to the Plan's mental/nervous limit. Essentially, she challenges a series of benefits determinations.[34]

---

**33.** Although it has not articulated a precise test, in *Pitman v. Blue Cross and Blue Shield,* 24 F.3d 118, 122–23 (10th Cir.1994), the Tenth Circuit cited *Brown* approvingly.

**34.** Mrs. Torre also argues paragraph four of Rider three supersedes the $1,000,000 medical and $50,000 mental/nervous limits. Specifically, she argues that as a result of paragraph four of Rider

13. There are two components to Mrs. Torre's first benefits claim. First, she argues Federated incorrectly classified Trisha's condition as a "mental illness." Second, she argues Federated incorrectly classified the nature of the treatment rendered by Laurel Ridge for Trisha's condition.

14. Mrs. Torre's first argument is without merit. The parties do not dispute that Trisha's condition is "organic" and physical in nature. The Plan, however, defines "mental illness" to include "psychiatric or psychological treatment of any physical condition." The "organic" nature of Trisha's condition is not alone dispositive. Accordingly, the relevant question is whether Federated violated § 1132(a)(1)(B) when it determined that Laurel Ridge was providing psychological treatment of Trisha's physical condition. To resolve this question, the court applies the *Brown* test. *See Reed v. American Express Co.,* 863 F.Supp. 1572, 1576 (S.D.Fla.1994)(applying *Brown* test to dispute over factual determination as opposed to plan interpretation); *Cargile v. Confederation Life Ins. Group Plans,* 748 F.Supp. 874, 878 n. 2 (N.D.Ga.1990) (noting *Brown* applies outside the context of plan interpretation and applying *Brown* test to benefits determination).[35]

■ 15. At the first step of the *Brown* inquiry, the court must determine whether Federated's decision was legally correct. More specifically, the question is whether Mrs. Torre proposed a sound alternative benefits determination; that is, one that can rival Federated's. *Reed,* 863 F.Supp. at 1577; *Cargile,* 748 F.Supp. at 879.

16. Trisha's case was complex. Federated made its initial benefits determination in December 1989, based on information received from the Menninger Clinic. That information included Menninger's pre-certification request for mental/nervous benefits, Menninger's status as a renowned psychiatric hospital, Menninger's billing statements containing diagnostic codes from the mental disorders section of the ICD9, and information from Menninger's staff (including Dr. William Kearns, Trisha's treating physician). The initial decision evolved as Federated obtained more information from Menninger and Laurel Ridge. Due to the complexity of the issues presented by Trisha's case, Federated decided to seek the assistance of an independent physician reviewer—in fact, over the course of Trisha's claim, Federated received a total of five reports from three different independent physician reviewers. In mid-January 1990, after examining the information available, including the review of Dr. Jordan, the independent physician assigned by the TMF, Federated gave Mrs. Torre the benefit of the doubt, overturned its initial decision, and paid all expenses from Menninger and Laurel Ridge as though they had been incurred for "medical evaluation." Shortly thereafter, based on the most recent information at its disposal, and assisted by another review from Dr. Jordan, Federated concluded that as of January 29, 1990, Laurel Ridge had begun to implement a psychological treatment plan. Following January 29, 1990, Federated continued to reexamine its allocation decision in light of the latest medical information from Laurel Ridge and the reports of Dr. Jordan and a second indepen-

three, Federated must cover, without limit, all medical or mental/nervous expenses incurred by emotionally handicapped children who are dependents of Plan participants. Thus, Mrs. Torre contends that, by the terms of the policy, as long as Trisha remained an "emotionally handicapped child," she never could exhaust her coverage under the Plan regardless of whether her treatment was medical or psychological or dispensed by a licensed Minnesota treatment facility. Mrs. Torre reads Rider three too broadly. Although the court does not address Rider three's affect on the Plan's medical and mental/nervous limits, the court concludes that Rider three requires only that Federated cover the treatment of emotionally handicapped children in a *"licensed residential*

*treatment facility, as defined by the State of Minnesota."* Rider three to Plan # 501. (Emphasis added). She did not demonstrate Laurel Ridge was such a facility. Her argument is without merit.

**35.** The court is aware that although these two district courts within the Eleventh Circuit have applied *Brown* to benefits determinations, the Eleventh Circuit has not yet conclusively addressed the issue. *See Marecek v. BellSouth Services, Inc.,* 49 F.3d 702, 707 (11th Cir.1995)(noting that the Eleventh Circuit has not explicitly determined the appropriate standard for reviewing an administrator's factual determinations, and declining to decide the issue).

dent physician reviewer. In April 1990, Federated attempted without success to locate a pediatric neurologist to perform another independent review. In May 1990, Mrs. Torre filed a formal request for review in which she asked that Federated assign a pediatric neurologist to the case. The TMF located a pediatric neurologist in June 1990. Federated then sent the TMF a formal request for review. The neurologist reviewed Trisha's case and the TMF prepared a report summarizing his conclusions. After it received the report, Federated overturned its earlier benefits determination and reallocated Trisha's expenses to the Plan's medical limit.

17. Mrs. Torre argues that the information available at the time Federated made its determinations indicated that Laurel Ridge was providing medical treatment. Mrs. Torre relies heavily on the opinion and testimony of Dr. Jerry Tomasovic, the pediatric neurologist who was Trisha's treating physician at Laurel Ridge. Dr. Tomasovic explained his diagnosis and treatment plan to Dr. Jordan, the first independent reviewer assigned by the TMF. Because Dr. Tomasovic was in contact with Dr. Jordan, who in turn reported to Federated, the court concludes that Dr. Tomasovic's opinion was available to Federated at the time it made the relevant benefits determinations. *See Reed*, 863 F.Supp. at 1575 (noting that "only those facts in possession of the administrator at the time of the determination should be considered by a court"). At trial, Dr. Tomasovic explained Trisha's condition in detail and discussed the treatment plan which Laurel Ridge designed to address her organic condition. In particular, he explained that the nature of Trisha's deficits prevented Laurel Ridge from using psychological interventions—that is, because Trisha would not respond to psychological interventions, the treatment plan had to be medical.

18. After considering the nature of the information upon which Mrs. Torre relies, and noting that the information was available to Federated when it made its challenged determinations, the court concludes that Mrs. Torre proposed an alternative that at least rivals Federated's. *Cf. Id.* at 1577 (relying, in part, on the opinion of the treating physician to support its conclusion that plaintiff's proposed benefits determination was sound).

19. At step two, the court must evaluate whether Federated was arbitrary and capricious in making a different benefits determination. The court's first inquiry relates to the conflict under which Federated appears to have operated. As authority for her conflict argument, Mrs. Torre cites to cases in which the defendants' conflict arose from a profit motive. Her implied argument, therefore, is that Federated misallocated her expenses in order to avoid a large claim and protect its profits. Mr. Utoft explained at trial that Federated does not administer the Plan for profit; instead, because the Plan covers its own employees, Federated attempts to set rates that will result in an expected loss of less than 100 percent.[36] More specifically, the rate formula he devises does not contain a profit variable. Although the absence of a profit motive may not necessarily cleanse Federated of the appearance of self-interest, *cf. Lee v. Blue Cross/Blue Shield of Alabama*, 10 F.3d 1547, 1552 (11th Cir.1994), the court concludes that Federated has demonstrated that its determinations were not motivated by a desire to protect its coffers by avoiding a potentially large claim. In fact, Federated demonstrated that, on a relative basis, Trisha's claim was not particularly noteworthy. Furthermore, Federated produced evidence that it maintains the $1,000,000 and $50,000 limits in an effort to keep the plan financially viable so that it can continue to provide coverage for all of its employees. Based on the manner in which Federated administered the Plan, and the

---

36. He also explained the concept of "pooling." Federated applies this concept so that any one health plan does not have to bear the cost of a catastrophic claim, or group of catastrophic claims, in any one year. By pooling all amounts over $75,000, Federated guaranteed that the cost to the Plan of Trisha's claim would be negligible. Furthermore, because Federated pays such a large volume of claims, Trisha's claim, relative to that overall volume, was minuscule. Mrs. Torre's argument that Federated allocated Trisha's treatment to the mental/nervous limit in order to avoid a potentially large claim is unpersuasive; the evidence provided by Federated belies her argument.

credible testimony of those responsible for making the benefits determinations involved here, the court concludes that Federated's determinations were consistent with an exercise of discretion by a fiduciary acting free of conflict. The court also concludes that Federated proved that when it made the challenged determinations, it operated exclusively in the interests of the Plan's participants and beneficiaries. In short, Federated has carried its burden and removed the taint of self-interest.

■ 20. Mrs. Torre still may prevail if she demonstrates that Federated's determinations were arbitrary and capricious by other measures. *Brown,* 898 F.2d at 1568. As previously noted, Trisha's case was complex. In an effort to understand better the issues involved, the Health Claims Department requested assistance from the MSG which, in turn, requested assistance from the TMF, an independent peer review organization. Federated availed itself of its in-house medical expertise and, when that proved insufficient, it turned to an independent outside resource: the TMF. Throughout the relevant time, Federated continually reexamined its previous benefits determinations in light of the latest medical information and TMF reports. Federated's decision to pay the costs of Trisha's treatment under the mental/nervous limit was informed and reasonable. Federated handled the complicated issues fairly and in good faith. The court concludes, therefore, that the manner in which Federated made the challenged determinations was not arbitrary and capricious. *Cf. Donato v. Metropolitan Life Ins. Co.,* 19 F.3d 375, 380 n. 3

(7th Cir.1994) (noting that, although the defendant was both fiduciary and insurer, the defendant terminated benefits only after an independent consultant twice concluded plaintiff was not disabled).

■ 21. Mrs. Torre's second benefits claim is that Federated erroneously denied full coverage of Trisha's tuition and fees from the Davison School.

22. Plan # 501 provides, in part, as follows: "[e]xpenses are considered Covered Expenses to the extent that the services or supplies provided are essential for the Necessary Care and Treatment of an Injury or a Sickness." The Plan further provides that to be considered "NECESSARY CARE AND TREATMENT OF AN INJURY OR A SICKNESS," the care, treatment, services, or supplies must not be "for the scholastic education or vocational training of the patient." The Plan again addresses "education" in the section listing "EXPENSES NOT COVERED," which provides as follows: "[c]overed expenses will not include, and no payment will be made for, expenses incurred: ... 14. for or in connection with Custodial Care, education or training." [37]

23. With the exception of speech and language therapy, Federated classified all services rendered by the Davison School as educational. Since it classified these services as educational, and since educational services are not covered by the Plan, Federated did not pay the majority of Trisha's tuition and fees.[38] Mrs. Torre argues, with little persuasive evidence in support,[39] that all services

---

37. The Plan defines Custodial Care, in part, as follows:
"CUSTODIAL CARE means care that consists of services and supplies that are given mainly to help a person to meet the activities of daily living, whether or not the person is disabled. They are not rendered mainly for their therapeutic value in the treatment of an Injury or Sickness. Custodial care includes, but is not limited to, care such as:
1. care mainly to provide room and board...."

38. However, Federated did cover all speech and language therapy under the Plan's medical limit.

39. Mrs. Torre did not offer the testimony of any personnel from the Davison School. Nor did she

offer any exhibits prepared by the Davison School which persuasively demonstrate that its tuition and fees are for medical rather than educational services. Instead, she relies heavily on Dr. Tomasovic's opinion, given during his testimony at trial, that the Davison School administered a medical program. Dr. Tomasovic's opinion regarding the nature of Davison's program does not illuminate the relevant issue: whether the tuition and fees remaining after Federated paid for Trisha's speech and language therapy were for medical or educational services. To the extent Mrs. Torre argues Dr. Tomasovic's testimony establishes that all of the tuition and fees were incurred for medical treatment, the court concludes that his testimony was overstated and unpersuasive.

rendered by the Davison School were medical and, therefore, Federated improperly denied coverage.

24. As with her first argument, Mrs. Torre does not contend that the Plan provisions at issue are ambiguous. She takes issue only with Federated's benefits determination.

25. Before Federated made the challenged determinations, it contacted the Davison School to request information about the program. At the time Federated made the challenged determinations, it was aware that Davison did not have medical facilities on campus and was not licensed as a hospital. In fact, the informational material prepared by Davison emphasized the scholastic and educational nature of its program. Federated repeatedly requested that Davison further explain its program and breakdown Trisha's bills. Davison's responses to these requests allowed Federated to distinguish only one element of the program from that generally provided by an academic institution: speech and language therapy. Federated "pulled-out" the expenses for speech and language therapy and paid them under the Plan's medical limit. Despite Federated's inquiries, at no time did Davison provide Federated with any information from which it reasonably could conclude that the remaining tuition and fees were related to medical treatment.[40] The court concludes, therefore, that Mrs. Torre fails to propose a determination that rivals Federated's. Additionally, even assuming Mrs. Torre carried her step one burden, the court concludes that she fails at step two because Federated's determinations were not arbitrary and capricious; that is, they were reasonable, in good faith, and consistent with an exercise of discretion by a fiduciary acting free of conflict.

■ 26. Mrs. Torre's third, and final, benefits claim is that Federated failed actively to assist her in placing Trisha in a residential treatment facility.

27. Section 1132(a)(1)(B) allows a participant or beneficiary to bring a civil action (1) to recover benefits due to her *under the terms of her plan,* (2) to enforce her rights *under the terms of her plan,* or (3) to clarify her rights to future benefits *under the terms of her plan.* Therefore, an essential element of Mrs. Torre's third benefits claim is some showing of an entitlement or right *under the terms of Plan # 501.* Federated argues that Mrs. Torre's "failure to assist" claim is not rooted in a benefit or right to which she is entitled under the terms of Plan # 501. The court agrees.

28. In the Memorandum and Order issued May 31, 1994, the court examined Mrs. Torre's third benefits claim. At that point, her claim was vague and ill-developed. In fact, she did not tie her claim to any of the Plan's provisions; instead, her claim consisted of vague references to various duties which Federated allegedly owed her. The court independently reviewed the Plan and found only two possible sources of authority for her argument: Riders three [41] and eleven. Out of an abundance of caution, the court "reluctantly" withheld entry of summary judgment for Federated. With the benefit of Mrs. Torre's evidence and her trial and post-trial argument, the court is able now to examine a fully developed version of her argument.

29. Paragraph four of Rider three states that Plan # 501 provides coverage for the treatment of emotionally handicapped children in licensed residential treatment facilities, as defined by Minnesota law. Rider three does not obligate Federated to provide an independent review for the purposes of diagnosing Trisha as an emotionally handicapped child. Nor does it obligate Federated actively to assist in the placement of emotionally handicapped children. Instead, it merely requires Federated to provide coverage for the treatment of emotionally handicapped children at a "licensed residential treatment facility, as defined by the State of Minnesota." Rider three requires Federated to provide coverage for emotionally handicapped children; it does not require Federated to place them.

---

40. Dr. Tomasovic's testimony does not illuminate the nature of the remaining tuition and fees.

41. Specifically, paragraph four of Rider three.

30. Rider eleven relates to pre-admission certification of inpatient hospital confinement. Pre-admission certification is done through an independent review organization. Under Rider eleven, a Plan participant or her physician has the duty to initiate pre-admission certification by making a request through her physician. Rider eleven does not obligate Federated to seek out covered providers for the Plan's participants. A participant's physician is the individual who is charged with the duty to locate a medically suitable facility. Rider eleven does not support Mrs. Torre's argument.

31. Neither paragraph four of Rider three nor Rider eleven, the only two Plan provisions which Mrs. Torre specifically references, required Federated actively to locate a suitable residential treatment facility for Trisha. In addition to reviewing Riders three and eleven, the court, once again, reviewed independently the entire Plan, including its Riders. The Plan, reasonably interpreted, does not contain the alleged "duty to assist." The Plan simply does not obligate Federated to place Trisha in a residential treatment facility; Mrs. Torre's argument to the contrary is not rooted in the terms of the Plan and is meritless. The court concludes that, because she cannot propose an alternative interpretation of Plan # 501 that rivals Federated's, Mrs. Torre's third benefits claim fails step one of the *Brown* test.

### b) *Discrimination claim*

32. Mrs. Torre brings her second ERISA claim under § 1140. She alleges Federated retaliated against her for filing a health claim and complaining about how Federated handled the claim. More specifically, she contends Federated retaliated by refusing her promotion or transfer and forcing her to open a Topeka Office with Jeff Richardson.[42]

33. Section 1140, Title 29, United States Code provides, in part, as follows: "[i]t shall be unlawful for any person to ... discriminate against a participant ... for exercising

any right to which [she] is entitled under the provisions of an employee benefit plan, ..., or for the purpose of interfering with the attainment of any right to which such participant may become entitled...."

34. Congress designed § 1140 to protect the employment relationship. *See Owens v. Storehouse Inc.,* 984 F.2d 394, 398 (11th Cir.1993); *Deeming v. American Standard, Inc.,* 905 F.2d 1124, 1127 (7th Cir.1990). *Cf. West v. Butler,* 621 F.2d 240, 245 (6th Cir.1980) (writing that "it appears Congress designed [§ 1140] primarily to protect the employment relationship that gives rise to an individual's pension rights"). "[A] fundamental prerequisite to a [§ 1140] action is an allegation that the employer-employee relationship, ..., was changed in some discriminatory or wrongful way." *Deeming,* 905 F.2d at 1127. Although plaintiffs who bring claims under § 1140 generally allege unlawful discharge, discharge is not a prerequisite to a § 1140 action. *Jess v. Pandick,* 699 F.Supp. 698, 699 (N.D.Ill.1988). *See also Gavalik v. Continental Can Co.,* 812 F.2d 834, 851 (3d Cir.1987)(explaining that "[s]ection [1140] ... is designed to *prevent* injury to employees' protected rights, not simply to redress the injury after the goals of a discriminatory plan have been effectuated"), *cert. denied,* 484 U.S. 979, 108 S.Ct. 495, 98 L.Ed.2d 492 (1987). Mrs. Torre alleges Federated discriminated against her in various employment-related decisions to punish her for pursuing her claim under the Plan; her allegations are sufficient.

35. In order to recover under § 1140, Mrs. Torre must show that the actions she challenges were motivated by an intent to discriminate against her for exercising her rights under the Plan or for the purposes of interfering with her attainment of benefits to which she may become entitled under the Plan. 29 U.S.C. § 1140. "[T]he essential element of proof under [§ 1140] is

---

42. In the Pretrial Order (Doc. 220), Mrs. Torre alleged various instances of "health claim-related" discriminatory treatment. At the summary judgment stage, the court attempted to identify these individual actions. Four were apparent: (1) reducing her assigned territory from all of Shawnee County to only the City of Topeka; (2) providing her with uncompetitive price quotes; (3) "forcing" her to open a Topeka office; and (4) failure to promote or transfer. The court concluded that there was no genuine issue of unlawful discrimination as to the first or second challenged actions.

specific intent to engage in proscribed activity." *Gavalik*, 812 F.2d at 851. Mrs. Torre may prove her case with either direct or circumstantial evidence. *Id.* at 852. Contrary to her assertions, she presents no direct evidence of specific intent.[43] Therefore, she must rely on indirect evidence.

■ 36. Since Mrs. Torre must rely on indirect evidence, the court applies the three-step burden shifting approach from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). *Gavalik*, 812 F.2d at 852–53; *Babich v. Unisys Corp.*, 842 F.Supp. 1343, 1352 (D.Kan.1994). The three-step approach is as follows: (1) Mrs. Torre has the initial burden to establish a prima facie case of unlawful discrimination; (2) once she carries her initial burden, Federated has the burden to produce a legitimate, non-discriminatory reason for taking the challenged action; and (3) if Federated carries its burden, Mrs. Torre has the ultimate burden to prove intentional discrimination, which may be done by showing that Federated's stated reason is a pretext for unlawful discrimination.

■ 37. Her first discrimination claim is that Mr. Lauritzen forced her to open a Topeka office to punish her for seeking benefits under the Plan.

38. Mr. Lauritzen became Mrs. Torre's DMM in December 1989. He had various ideas for his District. In late December 1989 he drove to Osage City to discuss them with Mrs. Torre. One of the subjects they discussed was Mr. Lauritzen's desire that she and Mr. Richardson open a joint office in Topeka, Kansas. He thought a joint office maintained by the two MRs who served Topeka would give Federated needed additional exposure within the city. At the meeting, Mrs. Torre discussed her health claim. Mr. Lauritzen was unaware of the claim. She also explained her frustrations about the way Federated was handling the claim. Mr. Lauritzen immediately set up a meeting between Mrs. Torre, himself, and Mr. Haegele. The three met in Kansas City later that same day.

■ 39. The idea to open an office in Topeka did not originate with Mr. Lauritzen. Approximately eight months earlier, Mrs. Torre and Mr. Richardson had discussed with Mr. Rohr and Mr. Haegele the possibility of opening a "cluster" office in Topeka. The impetus for the joint Topeka office was not her health claim but a continuation of the discussions regarding a "cluster-office." Furthermore, because he was unaware of her claim before she brought it up at the meeting, there is no causal link between Mr. Lauritzen's December discussion with Mrs. Torre regarding the Topeka office and her health claim. Since he was unaware of her claim at the time he encouraged her to open a Topeka office, Mr. Lauritzen could not have acted with the specific intent to discriminate against Mrs. Torre for pursuing the claim when he suggested she and Mr. Richardson

---

**43.** Federated's Corporate Counsel, Debra Remine, sent a letter, dated June 18, 1991, to the KCCR responding to Mrs. Torre's discrimination complaint. The letter states that Mrs. Torre "is in line for a career assessment." The letter also explains that Federated had not sent Mrs. Torre to Owatonna on May 17, 1991, for her career review, as it had intended, because Mrs. Torre's attorneys had been quick to reject any position Federated took. The letter does not state that Mrs. Torre was no longer being considered for promotion; in fact, it states that the possibility of receiving a career assessment "remains open for her consideration." The court concludes that Mrs. Torre misconstrues the letter when she offers it as direct evidence of retaliation.

Mrs. Torre's rather tenuous argument requires the court to read a single clause in isolation. Mrs. Torre contends that the court may consider the letter only insofar as it indicates Federated stopped the review process; specifically, she seeks to exclude from consideration that portion of the letter explaining *why* the process was stopped. She bases her argument on Federal Rule of Evidence 408. The court disagrees. First, it is unclear that settlement negotiations are involved. Second, the rule of completeness requires that the letter be read in context. Third, to the extent she admits the letter as direct evidence of discriminatory animus, she opens the door for consideration of portions of the letter which explain Federated's action—that is, put in context the statement upon which Mrs. Torre relies.

In short, the court concludes that the letter does not establish that Federated acted with the requisite specific intent; instead, it explains why Mrs. Torre had not yet received a career assessment and indicates that she still *"is "* in line for an assessment.

open a joint office. In short, she is unable to show Mr. Lauritzen urged her to open a Topeka office for the purpose of interfering with her attainment of rights under the Plan. The court concludes, therefore, that Mrs. Torre is unable to make an initial showing sufficient to support a reasonable inference of unlawful discrimination.

40. Nevertheless, even if Mrs. Torre could make her initial showing, the court concludes that she did not carry her ultimate burden of showing unlawful discrimination. Specifically, the court concludes that, through the testimony of Mr. Lauritzen and Mr. Haegele, and supporting exhibits, Federated produces legitimate, nondiscriminatory reasons for opening the office. Federated's reasons are persuasive. Mrs. Torre does not show that Federated's reasons are pretext for unlawful discrimination. Her first discrimination claim does not rise above mere speculation.

41. Mrs. Torre's second discrimination claim is that Federated refused to promote or transfer her to punish her for seeking benefits under the Plan. The essence of her second claim is retaliation. To prevail, she must demonstrate that Federated discriminated against her for exercising her rights under Plan #501.

42. Federated has no formal application procedure for promotion or transfer. Indeed, it has no formal procedure for the dissemination of information to its employees regarding job openings. Managers are expected to review the ranks for promotable people who then are placed in line for management appraisals and career assessments. An employee also is able to initiate this process on her own by expressing interest to her superiors. Mrs. Torre appears to have worked within Federated's somewhat amorphous system. The record clearly reflects that she made several inquiries about possible job openings. She expressed her desire to be considered for promotion or transfer to at least four of her superiors: (1) Mr. Kinnett; (2) Mr. Rohr; (3) Mr. Lauritzen; and (4) Mr. Haegele. The record also indicates that her superiors thought her to be an able, promotable MR; however, during the four years she was active as an employee at Fed-

erated, Mrs. Torre was never promoted or transferred. In fact, her progress through Federated's pipeline for promotion or transfer was incomplete: she never received a career assessment.

43. The court does not penalize Mrs. Torre for Federated's organizational structure. The court is persuaded that, within the system established and maintained by Federated, Mrs. Torre's repeated inquiries and her clear expression of her desire to be considered for promotion or transfer are sufficient to constitute an "application" for promotion or transfer. By concluding that Mrs. Torre's actions are the equivalent of an application, the court faces a more difficult question: What is the scope of her application? Mrs. Torre clearly expressed a general interest in being promoted. She seems to argue that Federated's subsequent failure to respond to her general requests by promoting or transferring her to any managerial or supervisory position, at any geographic location, is sufficient to establish a prima facie case under § 1140. The court disagrees.

44. Mrs. Torre's argument is simply too broad. She cites no authority to support her contention that a general request is tantamount to an application for any available position regardless of geographic location or job description. The prima facie case performs an important function: it eliminates the most common nondiscriminatory reasons for perceived acts of discrimination. *Cf. Burdine*, 450 U.S. at 253–54, 101 S.Ct. at 1093–94 (writing that the function of the prima facie case is to "eliminate[ ] the most common nondiscriminatory reasons for the plaintiff's rejection"). As a result, once shown, the prima facie case creates a presumption of unlawful discrimination. However, to create a presumption of unlawful discrimination, the prima facie case, at the very least, must be based on circumstances which give rise to a reasonable inference of discrimination. Mrs. Torre makes her argument at such a high level of generality that the circumstances she alleges fail to support a reasonable inference that Federated acted with the requisite specific intent.

45. The court recognizes that the lack of a formal application procedure makes it more

difficult for Mrs. Torre to prove a prima facie case. However, at the very least, Mrs. Torre must prove a basis from which the court may draw a reasonable inference of specific intent. It is neither reasonable nor practical to interpret her general expression of interest in promotion or transfer as an application for every available managerial or supervisory job whatever the nature and wherever the location. It is more reasonable to limit her expression of interest to those areas and for those jobs in which she expressed a particular interest. Additionally, insofar as it was Federated's company practice to promote from within a region, and given that she expressed her desire directly to Mr. Haegele, her RMM, Mrs. Torre's general request reasonably can be viewed as a request for promotion or transfer to available positions within the Central Region.

46. Before examining Mrs. Torre's claim, as limited in the previous paragraph, the court first sets forth a chronology of the relevant events. Mrs. Torre expressed a general interest in promotion even before she signed her contract February 10, 1988. Thereafter, she continued to make periodic general inquiries. In November 1989 Trisha entered the Menninger Clinic for evaluation. In November and December 1989, Federated received bills for her care. During November and December 1989, Mrs. Torre began searching for a residential treatment facility in which she could place Trisha following her evaluation at Menninger. At a meeting with Mr. Lauritzen in late December 1990, she expressed interest in promotion to an unspecified management position in Phoenix, Arizona. Mrs. Torre placed Trisha in Laurel Ridge on January 3, 1990. Mrs. Torre confirmed her previous discussion with Mr. Lauritzen in a letter, dated January 15, 1990, which she sent to both Mr. Lauritzen and Mr. Haegele. After receiving his copy of the letter, Mr. Haegele telephoned Mrs. Torre to advise her that he was unaware of any current management opportunities in Phoenix. At trial, Mr. Haegele explained that, at this time, he had no management openings in his Region. Following his telephone conversation with Mrs. Torre, Mr. Haegele wrote Mr. Kinnett a letter, dated January 18, 1990, in which he informed him of Mrs. Torre's interest in promotion, as well as her specific interest in Phoenix, and suggested she be sent for a career review that summer. Mr. Haegele also prepared a list, dated January 18, 1990, of his MRs whom he considered to be DMM candidates: out of all of his MRs, he ranked Mrs. Torre as the fourth best candidate. Laurel Ridge discharged Trisha April 22, 1990. Mrs. Torre then enrolled Trisha at the Davison School in Atlanta, Georgia. Mrs. Torre later expressed interest in promotion to a management position in Atlanta. Mr. Haegele informed her by letter that he had not yet heard of any openings in Phoenix or Atlanta. In early 1991 Mr. Haegele wrote Mr. Leighty to inform him of Mrs. Torre's interest in promotion and again asked that she be scheduled for a career review. Mr. Haegele then asked Mr. Lauritzen to prepare a management appraisal form on Mrs. Torre. Mr. Lauritzen complied; his appraisal was very favorable. Mr. Haegele concurred in Mr. Lauritzen's appraisal and signed the form. He then forwarded the form to Mr. Leighty. Mr. Leighty received the form; however, no action was taken. In September 1991 Mr. Haegele again ranked Mrs. Torre among his promotable MRs. She never received promotion or transfer. Her ability to receive health benefits was not directly affected by the fact she was neither promoted nor transferred; that is, she remained a participant, and Trisha a covered dependent, under the Plan.

47. Mrs. Torre argues generally that she was never promoted or transferred because she filed a potentially large benefits claim and tenaciously pressed it with Federated's staff. After examining the evidence, the court concludes that she fails to present evidence that supports a reasonable inference that Federated withheld promotion or transfer to punish her for filing and pursuing Trisha's health benefits claim.

48. Mrs. Torre sought promotion or transfer to a management-level position; however, she was not interested in promotion to a non-metropolitan area within the Central Region or a lateral move. As her RMM, Mr. Haegele had the authority to promote Mrs. Torre only to a DMM position within his Region. During the relevant time, only two

DMM positions opened in metropolitan areas in the Central Region. He filled the positions with one female, Scottie Scott, and one male, Mr. Lauritzen. Both Ms. Scott and Mr. Lauritzen were "street-hires" with greater tenure and experience with Federated than Mrs. Torre. Mrs. Torre does not establish that she possessed objective qualifications for the job that were roughly equivalent to those possessed by Ms. Scott and Mr. Lauritzen at the time of their promotions. Therefore, she does not eliminate one of the most common nondiscriminatory reasons for an employer's decision to promote one employee instead of another. Cf. Burdine, 450 U.S. at 253–54, 101 S.Ct. at 1093–94 (writing that the function of the prima facie case is to "eliminate[ ] the most common nondiscriminatory reasons for the plaintiff's rejection"); Burrus v. United Telephone Co. of Kansas, Inc., 683 F.2d 339, 342–43 (10th Cir.1982)(explaining, in a Title VII case, that objective qualifications are best addressed at step one of the three part burden shifting approach), cert. denied, 459 U.S. 1071, 103 S.Ct. 491, 74 L.Ed.2d 633 (1982). Furthermore, the court notes that Mr. Haegele, the RMM for the Central Region, continued to recommend her for promotion and request she receive a career review well after the incidents of late 1989 and 1990. The evidence does not support her claim that she was not promoted to a management position within the Central Region because she filed a claim against the Plan.

■ 49. As to opportunities within Phoenix and Atlanta, Mrs. Torre also fails to show circumstances that support a reasonable inference of specific intent. To establish her prima facie case, she must make a showing that eliminates the most common nondiscriminatory reasons for her nonselection. The most common nondiscriminatory reason for Mrs. Torre's nonselection for promotion or transfer would be that the individual chosen was more qualified, on an objective basis, than she. Federated's decision to choose another individual to fill a position requested by Mrs. Torre will not support an initial inference of specific intent without some showing of that individual's relative objective qualifications. Therefore, to make her prima facie case, she must establish, at least, that she was similarly qualified, on an objective basis, as those individuals chosen by Federated. Such a showing would support the inference that Federated decided not to promote or transfer her for a reason unrelated to the objective qualifications it established for the position. To satisfy her step one burden, Mrs. Torre presents general evidence in the form of miscellaneous position announcements and asks the court to assume from this general information either that she was more qualified objectively than those chosen or that she was similarly qualified. The position announcements provide only short biographies of the individual chosen to fill a specific position; they do not enable the court to make the relevant comparisons. Mrs. Torre relies almost entirely, and to her detriment, on these extremely general position announcements. To the extent these announcements were discussed at trial, the discussions did not illuminate the pertinent issue at step one: whether Federated selected individuals who possessed objective qualifications either less than or equal to Mrs. Torre's. The announcements are inadequate to accomplish the task to which Mrs. Torre has assigned them. Mrs. Torre had the burden to show that she was at least as well qualified, on an objective basis, as those chosen. She has not done so. As a result, her claim fails at step one of the three step burden shifting approach.

### B. Title VII

50. Two of Mrs. Torre's Title VII theories remain.[44] First, that Federated subjected her to disparate treatment because of her sex. Second, that Federated retaliated against her because of her formal and informal complaints of sex discrimination.

#### 1) Disparate treatment: Terms and conditions

51. Title VII proscribes certain discriminatory employment practices. Section

---

44. In the Pretrial Order (Doc. 220), Mrs. Torre alleged disparate treatment, disparate impact, and retaliation. Federated moved for summary judgment as to her disparate treatment and disparate impact theories. The court granted Federated's motion as to her disparate impact theory and granted-in-part and denied-in-part Federated's motion as to her disparate treatment theory.

2000e–2(a), Title 42, United States Code, provides, in part, as follows:

(a) *It shall be an unlawful employment practice for an employer—*

(1) to fail or refuse to hire or to discharge any individual, or otherwise *to discriminate against any individual with respect to his* compensation, *terms, conditions, or privileges of employment, because of such individual's* race, color, religion, *sex,* or national origin.

(Emphasis added). Mrs. Torre alleges two discriminatory acts.[45] First, Federated's selection of Mr. Richardson, instead of her, to receive the Monthly Leadership Council Award in April, 1991. Second, Mr. Haegele's failure to present the 1991 Big Hitter Award to her at the Central Region's kickoff meeting.

52. Mrs. Torre proceeds on a disparate treatment theory; therefore, the question is whether Federated intentionally treated her less favorably than others because of her sex. *Torre,* 854 F.Supp. at 802 (citing *Drake v. City of Fort Collins,* 927 F.2d 1156, 1160 (10th Cir.1991). *See also Craik v. Minnesota State University Board,* 731 F.2d 465, 468–69 (8th Cir.1984). In *McDonnell Douglas,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and *Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), the United States Supreme Court established the analytical framework applicable to Title VII actions premised on a disparate treatment theory. The Supreme Court recently discussed this framework in *St. Mary's Honor Center v. Hicks,* —— U.S. ——, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

 53. The framework generally is as follows: (1) Mrs. Torre's prima facie case; (2) Federated's production of a nondiscrimi-

natory reason to rebut Mrs. Torre's initial showing; and (3) Mrs. Torre's demonstration that Federated's reason is merely a pretext for unlawful discrimination. Although Federated bears the burden of production at stage two, Mrs. Torre retains the ultimate burden to persuade the court that she was the victim of intentional discrimination. *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095.

 54. At the first step of the framework, Mrs. Torre must produce evidence sufficient to support an inference that Federated took the two challenged actions because of her sex. *Favors v. Fisher,* 13 F.3d 1235, 1237 (8th Cir.1994); *Craik,* 731 F.2d at 469. She may accomplish this by proving that (1) she is a member of a protected class; (2) she was entitled to the desired terms and conditions of employment; (3) Federated denied her the desired terms and conditions; and (4) employees outside her protected class were granted the desired terms and conditions. *Torre,* 854 F.Supp. at 807 (citing *Boyd v. Telecable of Overland Park, Inc.,* 752 F.Supp. 388, 392 (D.Kan. 1990); *Moore v. Norfolk and Western Ry. Co.,* 731 F.Supp. 1015, 1019 (D.Kan.1990)). By establishing her prima facie case, Mrs. Torre creates a presumption of unlawful discrimination. *See Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094. Federated must then rebut this presumption by producing evidence that it took the adverse employment actions for legitimate, nondiscriminatory reasons. *See Id.* To carry its burden of production, Federated " 'must clearly set forth, through the introduction of admissible evidence,' [a] reason[ ] for [its] actions which, *if believed by the trier of fact,* would support a finding that unlawful discrimination was not the cause of the employment action." *See St.*

---

45. In the Pretrial Order (Doc. 220), Mrs. Torre alleged various instances of sex-based disparate treatment. She did not claim hostile environment, nor did she try such a claim under Federal Rule of Civil Procedure 15(b), nor did the evidence presented support such a claim under the standards articulated in *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 2405–06, 91 L.Ed.2d 49 (1986) and reaffirmed in *Harris v. Forklift Systems, Inc.,* —— U.S. ——, ——, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993). Instead, she merely claimed that certain actions were themselves discriminatory. At the sum-

mary judgment stage, the court attempted to identify these individual actions. Five were apparent: (1) failure to promote or transfer; (2) "forcing" her to open a Topeka office; (3) providing her with uncompetitive price quotes; (4) failing to give her the Monthly Leadership Council Award in April 1991; and (5) failing to acknowledge her as a Big Hitter at the Central Region's annual kickoff meeting. The court concluded that there was no genuine issue of sex-based discrimination as to the first, second, or third challenged actions.

*Mary's Honor Center,* —— U.S. at ——, 113 S.Ct. at 2747 (quoting *Burdine,* 450 U.S. at 254–55, 101 S.Ct. at 1094).[46]

55. Once Federated meets its burden of production, and thereby rebuts Mrs. Torre's prima facie case, the initial presumption of intentional discrimination "simply drops out of the picture."[47] *See Id.* (quoting *Burdine,* 450 U.S. at 255, 101 S.Ct. at 1094–95). At this point, Mrs. Torre has the opportunity to show that Federated's proffered reasons were not the true reasons but were merely pretexts for discrimination. *See Id.* It is important to reiterate that the ultimate question is whether Federated intentionally discriminated against Mrs. Torre. If at step three the court rejects Federated's proffered reason as pretextual, the court may then conclude that Federated engaged in intentional discrimination. However, merely rejecting Federated's proffered reason as pretextual, without more, does not compel a conclusion in favor of Mrs. Torre. At step three, she must show that Federated's reason is a pretext for discrimination. Federated's proffered reason "cannot be proved to be a 'pretext *for discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *See Id.* at ——, 113 S.Ct. at 2752 (quoting *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093). *Cf. Flasher,* 986 F.2d at 1321 (writing that "Title VII only reaches pretextual cases where the advanced reason is shown to be a pretext for a discriminatory animus based upon a person's protected status"). Therefore, it is not enough that the court disbelieve Federated; it must believe Mrs. Torre's explanation of intentional discrimination. *See Id.* at ——, 113 S.Ct. at 2754.

56. Having reviewed the applicable framework, the court now turns to an application of that framework.

57. Mrs. Torre's first Title VII claim is that, based on her sex, Federated chose not to give her the Monthly Leadership Council Award in April 1991. Specifically, she challenges Federated's selection of Mr. Richardson, instead of her, to receive the Award for April.

58. Each month Federated names a group of MRs to the Monthly Leadership Council. Each RMM is responsible for selecting from among all of his MRs one or two recipients. Mr. Haegele has 60 MRs. No more than one or two MRs from a single region are to receive the award in a given month. A MR may not receive the award twice in one year. Mr. Haegele selected Mrs. Torre in 1988, 1989, and 1990. At the very most, in a single year, Mr. Haegele could give the Award to only 24 of his 60 MRs. Selection may be based on any one of the following factors: (1) "60–60–30" participation; (2) total production leadership for the month; (3) production leadership in a particular line; (4) outstanding service to clients; (5) a specific case of outstanding service to a client; (6) a specific instance or combination of actions that indicate outstanding service to the company; or (7) outstanding total job performance.

59. Mr. Lauritzen recommended Mr. Haegele select Mr. Richardson for April, 1991, because of a specific case of outstanding service to a client. Mr. Haegele concurred and selected Mr. Richardson. Mrs. Torre argues Mr. Haegele selected Mr. Richardson, instead of her, because Mr. Richardson is male and she is female. She points to her higher sales production as evidence that she was qualified to receive the award. Neither Mr. Lauritzen nor Mr. Haegele testified that Mrs. Torre was unqualified. Indeed, at trial, both men readily agreed that Mrs.

**46.** Federated need not persuade the court it was actually motivated by the proffered reasons. *Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094. *See also Equal Employment Opportunity Commission v. Flasher Company, Inc.,* 986 F.2d 1312, 1316 n. 4 & 1317–18 (10th Cir.1992) (explaining the employer's step two burden).

**47.** After an employer meets its burden of production, "the factual inquiry proceeds to a new level

of specificity." *Burdine,* 450 U.S. at 255, 101 S.Ct. at 1095. "[T]he inquiry now turns from the few generalized factors that establish a prima facie case to the specific proofs and rebuttals of discriminatory motivation the parties have introduced." *St. Mary's Honor Center,* —— U.S. at ——, 113 S.Ct. at 2752. An employee's demonstration that an employer's proffered reason is false is part of her proof that the real reason for the employer's action was intentional discrimination. *Id.* at ——, 113 S.Ct. at 2753.

Torre was a very productive MR, an objective factor that would seem to qualify her for the award.

60. The court concludes that Mrs. Torre established a prima facie case. Specifically, she established she is a member of a protected class, she was qualified, at least objectively, to receive the award in April 1991, and Federated denied her the award in favor of another employee outside her protected class. The court also concludes that Federated carried its burden of production; that is, Federated presented a legitimate, nondiscriminatory reason for selecting Mr. Richardson: he provided particularly good service to a client in April. Because Federated carried its burden of production, the court next examines the evidence in support of Mrs. Torre's argument that Federated's reason is merely a pretext for unlawful discrimination.

■ 61. The Tenth Circuit has pointed out various items of evidence which may be relevant to a showing of pretext. Three of which are as follows: (1) the employer's prior treatment of the plaintiff; (2) the employer's general policy and practice with respect to the employment of females, especially statistics reflecting a general pattern and practice of discrimination; and (3) the use of subjective criteria, particularly when used to evaluate candidates that are not objectively equally qualified. *Colon–Sanchez v. Marsh,* 733 F.2d 78, 81 (10th Cir.1984), *cert. denied,* 469 U.S. 855, 105 S.Ct. 181, 83 L.Ed.2d 115 (1984); *Mohammed v. Callaway,* 698 F.2d 395, 399 (10th Cir.1983). The list is intended not to be exclusive, but, instead, to illustrate methods by which pretext may be shown. *Colon–Sanchez,* 733 F.2d at 81. No single item is required proof in every case. *Id.* Nor is the presence of any single item necessarily dispositive. The items merely are relevant to the court's determination of which party's explanation of the employer's motivation it believes. *Cf. Beck v. QuikTrip Corp.,* 708 F.2d 532, 535 (10th Cir.1983)(stating that, at step three, the trial court's duty is

"relatively straightforward," it simply " 'must decide which party's explanation of the employer's motivation it believes' ")(quoting *United States Postal Service Board of Governors v. Aikens,* 460 U.S. 711, 716, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983)).

■ 62. To show pretext, Mrs. Torre (1) argues Mr. Haegele and Mr. Lauritzen's testimony was not credible, (2) presents "statistical" evidence, and (3) points to various instances of allegedly discriminatory conduct.

63. The court rejects her argument that Mr. Lauritzen and Mr. Haegele were not credible. At trial, both men credibly and persuasively explained their decision to select Mr. Richardson. Furthermore, although the reason Mr. Richardson received the award is subjective (the quality of service rendered to a client), and the reason Mrs. Torre believes she should have won the award can be measured objectively (the level of overall sales production), the court concludes that, based on the credibility of Mr. Lauritzen and Mr. Haegele's testimony, neither man used his discretion to favor Mr. Richardson because he is male or disfavor Mrs. Torre because she is female. Instead, Mr. Richardson, who struggled as a MR, was selected over Mrs. Torre, who did not, in an effort to recognize his efforts, give him positive reinforcement for performing well, and encourage him in the future.

64. As to her "statistical" evidence, the court concludes that it is not in any sense statistical.[48] The court, nevertheless, reviews it to determine if it supports a reasonable inference of sex-based discrimination. The evidence demonstrates that certain males were promoted or transferred to certain positions within the company, certain individuals received certain awards, and certain participants in an advanced marketing seminar received career reviews. Mrs. Torre apparently intends it to demonstrate that Federated applied its personnel policies in a discriminatory manner. Her evidence,

---

**48.** In previous submissions to the court, and at trial, Mrs. Torre referred to certain items as representing "statistical" evidence. These items are a loosely organized jumble of photocopies of promotion announcements, position realignments, and awards. In addition, she submitted a

photograph of the members of the President's Council, a photograph of the participants in an Advanced Marketing Seminar, a list of individuals who received career reviews, and a handwritten list of other employees whom she believes were promoted or transferred.

however, does not eliminate nondiscriminatory explanations for disparate treatment; therefore, it does not provide a reasonable basis for the conclusion that Federated applied its personnel policies in a discriminatory way. *See Rea v. Martin Marietta Corp.*, 29 F.3d 1450, 1456 (10th Cir.1994)(ADEA case); *Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 532 (10th Cir. 1994)(ADEA case); *Fallis v. Kerr–McGee Corp.*, 944 F.2d 743, 746 (10th Cir. 1991)(ADEA case). The court concludes that the evidence is unpersuasive on the issue of whether Federated withheld from Mrs. Torre the April 1991 Leadership Council Award because of her sex.

 65. Mrs. Torre also contends that she was subjected to frequent instances of sex-based bias.[49] Mrs. Torre was hired in early February 1988. She went on disability in late March 1992. Over the course of her four years as a fully-active MR, she contends that she experienced objectionable conduct at a training session at Owatonna, as well as at several other Federated functions,[50] and several different Federated employees made objectionable comments to her or in her presence at various Federated functions.[51] At least one of the incidents—the film of the man defecating—is, although offensive, if not wholly unrelated to sex, at least critically vague as to its relationship. Another incident—the circulation of the photograph of the nude male—was rectified by Mrs. Torre's

supervisor as soon as she brought it to his attention. Of the comments she points to, the court finds it particularly noteworthy that none were made or condoned by her immediate supervisors or members of upper management: the individuals responsible for administering Federated's personnel policies as they affected Mrs. Torre. *Cf. Rea*, 29 F.3d at 1457 (stating, in an ADEA case, that, in order for comments to show discriminatory animus, the employee had to demonstrate a causal nexus between the comments and the challenged action); *Cone*, 14 F.3d at 531 (stating, in an ADEA case, that "[i]solated comments, unrelated to the challenged action, are insufficient to show discriminatory animus ..."); *Hong v. Children's Memorial Hospital*, 993 F.2d 1257, 1266 (7th Cir.1993)(holding that even a supervisor's occasional use of ethnic slurs are insufficient to show that employer relied on illegitimate criteria where the comments are unrelated to the decisional process), *cert. denied,* —— U.S. ——, 114 S.Ct. 1372, 128 L.Ed.2d 48 (1994); *Figures v. Board of Pub. Utils.*, 967 F.2d 357, 360–61 (10th Cir.1992)(affirming trial court's exclusion of comments where plaintiff could not link them to personnel actions). Although some of the conduct and comments reinforce her general description of Federated as a "boys' club," a description corroborated by Scottie Scott, a female DMM within Mr. Haegele's Region, the court concludes that Mrs. Torre does not develop her "boys'

---

**49.** Mrs. Torre points to various incidents and comments which she contends establish an atmosphere of pervasive sexual bias. It is important to note that she does not allege hostile environment, but, instead, presents these incidents and comments as evidence of pretext. Proof of a discriminatory atmosphere may be relevant in proving pretext. *See, e.g., Ezold v. Wolf, Block, Schorr and Solis–Cohen*, 983 F.2d 509, 546 (3rd Cir.1992) ((recognizing that "proof of a discriminatory atmosphere may be relevant in proving pretext"), *cert. denied,* —— U.S. ——, 114 S.Ct. 88, 126 L.Ed.2d 56 (1993); *Parker v. Secretary, United States Dept. of Housing and Urban Development*, 891 F.2d 316, 322 (D.C.Cir.1989)(noting that proof of a discriminatory atmosphere could be relevant in proving individualized discrimination); *Conway v. Electro Switch Corp.*, 825 F.2d 593, 597 (1st Cir.1987)(explaining that "[w]hile evidence of a discriminatory atmosphere may not be conclusive proof of discrimination against an individual plaintiff, such evidence does tend to add 'color' to the employer's decision-making

processes and to the influences behind the actions taken with respect to the individual plaintiff").

**50.** For example, at Owatonna, females were housed off-site, male MRs went to strip-bars, and she had difficulty obtaining a loaner car to go to cultural events and plays; and at other Federated functions, a film was shown of a man defecating and a picture was circulated of a nude man with a large penis.

 In addition, both Mrs. Torre and Scottie Scott testified to the existence of a "boys' club" atmosphere at Federated.

**51.** For example, in the presence of Mr. Lauritzen and other MRs, a MR told her she should go along to a strip bar with them so she could learn a trade she could use if she lost her job at Federated. However, she points to no objectionable comments made by decision makers related to the decisional process itself.

club" contention to the point that the court reasonably can conclude that, more likely than not, the decision makers involved here were motivated by discriminatory animus. Furthermore, all the evidence presented indicates that her immediate supervisors—the individuals responsible for the decisions she challenges—were receptive and responsive to her complaints about objectionable conduct and comments. There is no credible evidence to the contrary. Thus, the court concludes that Mrs. Torre's evidence of "discriminatory atmosphere" consists almost entirely of isolated incidents and stray remarks that, when viewed reasonably, are insufficient to establish that Federated, more likely than not, engaged in illegal discrimination.

66. Federated credibly and persuasively explained why it chose Mr. Richardson over Mrs. Torre. In short, the court believes Federated's explanation. Therefore, as to her claim that Federated unlawfully selected Mr. Richardson over her, the court concludes that Mrs. Torre fails to carry her ultimate burden of persuasion. That is, she fails to show that Federated's nondiscriminatory reason is a pretext for discrimination.

67. Her second Title VII claim involves Mr. Haegele's failure to present her with the 1991 Big Hitter Award at the Central Region's kickoff meeting.

68. Federated recognizes the recipients of the Big Hitter Award at each recipient's respective annual regional kickoff meeting. When Mrs. Torre won the award in 1990, she was recognized at the Central Region's kickoff meeting. The purpose of the kickoff meeting is to build excitement for the upcoming year. Mr. Haegele uses the Central Region's meeting to promote the successes of the previous year in an effort to elevate expectations for the coming year and create momentum. Attendance at the kickoff meeting is mandatory for MRs and DMMs. Additionally, members of Federated's upper management frequently attend. In 1991 only one of the sixty MRs assigned to the entire Central Region won the award, a number much lower than in the past (for example, in the previous year, five of Mr. Haegele's MRs won the award). Mr. Haegele testified that he was embarrassed his Region had not per-

formed better. He decided it would detract from the purpose of the meeting to emphasize what he perceived as a regional, and, therefore, personal, failure. As a result of this decision, he did not present Mrs. Torre with the 1991 award at the Central Region's kickoff meeting.

69. Although she did not receive public recognition at the meeting, Mrs. Torre was recognized in Federated's internal publication, which was circulated to management, including upper management, as well as other employees throughout the company. The members of Federated's upper management who were present at the meeting knew Mrs. Torre had won the award. Mr. Leighty, who was present at the meeting, chastised Mr. Haegele for failing to present her with the award. Mr. Lauritzen also confronted Mr. Haegele about his failure to present her with the award. At trial, Mr. Haegele did not attempt to defend his decision, but, instead, admitted he made a mistake.

70. The court concludes that Mrs. Torre established a prima facie case. Specifically, she established she is a member of a protected class, she was qualified to receive public recognition at the meeting, Mr. Haegele did not publicly recognize her at the meeting, and Mr. Haegele recognized male recipients at previous kickoff meetings. The court also concludes that Federated carried its burden of production; that is, Federated presented a nondiscriminatory reason for not presenting her with the award at the kickoff meeting: Mr. Haegele did not want to detract from the purpose of the meeting by emphasizing a perceived regional and personal failure. Because Federated carried its step two burden of production, the court next examines the evidence in support of Mrs. Torre's argument that Federated's reason is merely a pretext for unlawful discrimination

71. To show pretext, Mrs. Torre (1) argues Mr. Haegele's testimony was not credible, (2) presents "statistical" evidence, and (3) points to various instances of allegedly discriminatory conduct. The court incorporates its previous discussion of her second and third items.

# 1376

72. After much consideration, the court rejects Mrs. Torre's argument that Mr. Haegele was not credible. His action did not, on balance, deprive her of the type of recognition that would increase her exposure within the company: her achievement was announced in Federated's internal publication. Thus, Federated informed its upper management and her fellow employees that she earned the Big Hitter Award. However, as a whole, the Central Region did not perform well in the Big Hitter contest. Mr. Haegele's decision not to announce at the meeting that only one of his 60 MRs qualified to receive the Big Hitter Award is consistent with the undisputed purpose of the meeting: to emphasize the successes of the previous year in order to raise expectations and build momentum for the next year. Further, in that his decision was an attempt to mask a perceived personal failure, it is consistent with Mr. Haegele's own selfish interest in putting his best foot forward in front of his superiors who attended the meeting. Mr. Haegele simply subordinated Mrs. Torre's individual accomplishment to the overall purpose of the meeting and his own selfish interest.

73. Mr. Haegele credibly and persuasively explained why he did not recognize Mrs. Torre at the kickoff meeting. In short, the court believes Federated's explanation. Therefore, as to her claim that Federated unlawfully failed to recognize her as a Big Hitter, the court concludes that Mrs. Torre fails to carry her ultimate burden of persuasion. That is, she fails to show that Federated's nondiscriminatory reason is a pretext for discrimination. Obviously critical to this conclusion is the court's determination that Mr. Haegele's testimony was credible. The court does not endorse his decision but concludes only that he was motivated by selfishness rather than illegal discriminatory animus.

### 2) *Retaliation*

74. It is unlawful for an employer to retaliate against an employee who has engaged in Title VII protected activity. 42 U.S.C. § 2000e–3(a). Because Mrs. Torre produces no direct evidence of retaliation, the court applies the three-step burden shifting approach. At step one, Mrs. Torre must establish a prima facie case of retaliation. To establish a prima facie case, Mrs. Torre must prove the following: (1) she engaged in protected opposition to discrimination or participated in a proceeding arising out of discrimination; (2) adverse action by her employer subsequent to the protected activity; and (3) a causal connection between such activity and the employer's action. *See Archuleta v. Colorado Dept. of Institutions,* 936 F.2d 483, 486 (10th Cir.1991); *Allen v. Denver Public School Board,* 928 F.2d 978, 985 (10th Cir.1991); *Anderson v. Phillips Petroleum Co.,* 861 F.2d 631, 634 (10th Cir.1988). At step two, the burden of production shifts to Federated to articulate a legitimate, non-discriminatory reason for the adverse action. *Anderson,* 861 F.2d at 634. If Federated carries its step two burden, Mrs. Torre still may prevail if she demonstrates Federated's reason was a mere pretext for discrimination. *Id.*

75. Mrs. Torre contends that Federated retaliated against her for complaining informally about various instances of perceived about sex discrimination and filing formal discrimination complaints with the EEOC and the KCCR in May 1991. The court examines her retaliation claim with respect to the following five acts: (1) failing to promote or transfer her; (2) forcing her to open a Topeka office; (3) providing her with unreasonable price quotes; (4) failing to give her the Leadership Council Award in April 1991; and (5) failing to publicly recognize her as a recipient of the 1991 Big Hitter Award at the Central Region's annual kickoff meeting.

76. Mrs. Torre's first claim is that Federated retaliated by failing to promote or transfer her. Her Title VII retaliation claim is, essentially, the same as her ERISA discrimination claim.[52] Instead of arguing Federated punished her for pursuing health benefits, she argues Federated denied her promotion or transfer because she complained,

---

**52.** The court incorporates the previous discussion of Federated's system for promotion or transfer.

informally and formally, about various instances of sex discrimination.

77. The court limits her general promotion or transfer claim as before; accordingly, the question is whether Federated retaliated by failing to promote her to a DMM position within the Central Region or failing to promote or transfer her to positions in Phoenix or Atlanta. The court incorporates its previous comments about the qualifications of the two individuals promoted to the two open DMM positions in the Central Region as well as its comments about the inadequacy of Mrs. Torre's showing regarding the relative objective qualifications of those promoted to positions in Phoenix and Atlanta and herself. Thus, as an initial matter, the court concludes that (1) Mr. Lauritzen and Ms. Scott had greater experience and tenure with Federated and (2) Mrs. Torre has failed to present evidence sufficient to enable the court to compare the objective qualifications of those who received promotions in Phoenix and Atlanta with her own; that is, she fails to present evidence adequate to remove the most common nondiscriminatory reason for her nonselection.

78. Mrs. Torre contends that Federated retaliated because she complained informally to Mr. Noyce, Mr. Rohr, Mr. Lauritzen, and Mr. Haegele and formally to the EEOC and KCCR. She made her first informal complaint to Mr. Noyce in 1988;[53] thereafter, she complained periodically to her DMMs (for example, she complained to Mr. Rohr about a photograph and to Mr. Lauritzen about a comment made by Jerry Bunker) and her RMM (for example, she complained to Mr. Haegele about not receiving the Big Hitter Award at the Central Region's annual kickoff meeting in December 1991). She filed formal complaints May 23, 1991.

79. In Federated's system, the appraisals prepared by DMMs and recommendations given by RMMs are critical to the advancement of MRs. Without their positive ap-

praisals and recommendations, it is not possible for a MR to gain promotion. The record is clear that despite her periodic complaints, both informal and formal, the individuals critical to her advancement continued to give her positive appraisals and recommendations. For example, (1) Mrs. Torre complained to Mr. Rohr about an offensive photograph that was passed around by other MRs at a meeting in June 1988, yet Mr. Rohr subsequently recommended her to receive the Monthly Leadership Council Award in both 1988 and 1989; (2) Mrs. Torre complained to Mr. Lauritzen in late 1990 about a comment Jerry Bunker made to her, yet Mr. Lauritzen subsequently supported her efforts to obtain the 12 percent expense reimbursement and prepared a management appraisal in which he recommended her promotion; (3) Mrs. Torre filed a formal complaint May 23, 1991, yet on lists prepared September 13, 1991, Mr. Haegele continued to rank her as one of his most promotable MRs; and (4) Mrs. Torre complained to Mr. Haegele about failing to present her with the Big Hitter Award at the December 1991 kickoff meeting, yet Mr. Haegele credibly testified that he continued to consider her for promotion up to the time she went on disability.

80. Mrs. Torre alleges retaliation; however, she fails to make an initial showing of retaliatory animus. More specifically, she fails to make an initial showing which removes the most common nondiscriminatory reason for her nonselection. Additionally, the credible, persuasive evidence in the record indicates that the relevant decision makers continued to recommend her for awards and advancement after she made her informal and formal complaints of discrimination. The conduct of these individuals is inconsistent with her claims that they acted to punish her for protected conduct. The court concludes, therefore, that Mrs. Torre fails to establish retaliation.

53. The court discounts the complaints she made to Mr. Noyce. Mr. Noyce was not an individual who had any input in whether she received promotion or transfer. He never relayed her complaints to any individual who could affect whether she advanced within the company. Because Mr. Noyce had no input into the decisions which

Mrs. Torre contends were retaliatory, and because he never informed individuals who did have input into those decisions of her complaints at Owatonna, her subsequent failure to receive promotion or transfer cannot reasonably be said to have been the result of this "oppositional conduct."

 81. Mrs. Torre's second claim is that Federated retaliated by forcing her to open a Topeka office. In 1988 Mrs. Torre complained informally about instances of perceived sex discrimination to Mr. Noyce during her initial training session in Owatonna, Minnesota, and Mr. Rohr during a meeting in Hays, Kansas. Mrs. Torre argues that her complaints to Mr. Noyce and Mr. Rohr constitute protected conduct for which she was punished by being forced to open an office in Topeka. The decision to open the office ultimately was made by Mrs. Torre in early 1990.[54] Mr. Rohr and Mr. Haegele discussed with Mrs. Torre and Mr. Richardson the subject of a Topeka office as early as March 1989. In December 1989 Mr. Lauritzen took over as Mrs. Torre's DMM. He met with Mrs. Torre in late December 1989 to discuss various topics, one of which was his desire that she share a Topeka office with Mr. Richardson. Mr. Lauritzen suggested she open a Topeka office because he thought it would increase Federated's presence in Topeka. There is no evidence that, during the relevant time, either Mr. Lauritzen or Mr. Haegele was aware of the complaints she had made to Mr. Noyce and Mr. Rohr. That is, there is no evidence that the relevant decision makers were aware of Mrs. Torre's complaints about sex-based discrimination. Thus, their suggestion that she open a Topeka office, and subsequent encouragement that she do so, could not have been in retaliation for lodging her informal complaints. *Williams v. Rice*, 983 F.2d 177, 181 (10th Cir.1993). *See also Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir.1993)(noting that to establish "causal Link" element of her prima facie case, a plaintiff, "[a]t a minimum, ... must generally establish that the employer was actually aware of the protected expression at the time it took adverse employment action"); *Long v. AT & T Information Systems, Inc.*, 733 F.Supp. 188, 205 (S.D.N.Y.1990) (granting employer summary judgment where plaintiff could not show that supervisor responsible for adverse action knew employee previously had engaged in protected conduct). Never-

theless, even if Mrs. Torre's complaints to Mr. Noyce and Mr. Rohr are protected conduct, and even if there is sufficient temporal nexus between her complaints and the challenged conduct, and even if knowledge of these complaints can be imputed to Mr. Lauritzen and Mr. Haegele, Federated produced a legitimate, nondiscriminatory reason for encouraging her to open a Topeka office. Mr. Lauritzen and Mr. Haegele's testimony on this matter was credible and persuasive. Mrs. Torre's pretext argument is based largely on mere speculation and surmise. The court concludes that she did not show that Federated's reason was a pretext for discrimination. Therefore, as to the Topeka office issue, even if the court imputes knowledge to the relevant decision makers, her retaliation claim fails. *Cf. Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir.1989)(explaining that "mere knowledge on the part of an employer that an employee it is about to fire has filed a discrimination charge is not sufficient evidence of retaliation to counter substantial evidence of legitimate reasons for discharging that employee").

 82. Mrs. Torre's third claim is that Federated retaliated by providing her with unreasonable price quotes. She argues Federated intentionally inflated her quotes so that she would lose business. In the Findings of Fact, the court determined that she did not receive inflated quotes. Although she lost business to lower priced competitors, Federated credibly and persuasively explained that the insurance market in Kansas was very price competitive at this time. Federated's competitors, particularly Farmland Industries, were lowering their rates in an attempt to increase market share. Federated provided Mrs. Torre with discretionary credit on a basis similar to, and, in some cases, more favorable than, other MRs in the area. Her evidence does not establish that she received quotes different from other Federated MRs serving the same type of clients in Kansas. Her claim that she was singled out and fed unreasonable quotes to punish her for complaining about discrimina-

---

54. Additionally, the evidence supporting her claim that she was "forced" to open an office in Topeka is very weak.

tion is unsupported by the evidence. She is unable to demonstrate adverse action. The court further notes that the relevant decision makers, particularly June Van Hoff, were unaware of her complaints about discrimination; therefore, they could not have been retaliating for her complaints of perceived sex discrimination. *Williams,* 983 F.2d at 181. *See also Goldsmith,* 996 F.2d at 1163; *Long,* 733 F.Supp. at 205. Accordingly, the court concludes that, as to the Topeka office issue, her retaliation claim fails.

83. Mrs. Torre's fourth claim is that Federated retaliated by failing to give her the Leadership Council Award in April 1991. Mrs. Torre received the Monthly Leadership Council Award in 1988, 1989, and 1990. She did not receive it in 1991. She points to Federated's selection of Mr. Richardson in April 1991 as a specific instance of retaliation. Mr. Lauritzen and Mr. Haegele testified that Federated chose Mr. Richardson because he delivered particularly good service to a client that month, which is one of the criteria alone sufficient to justify selection for the award. There is no evidence he did not provide particularly good service in April. Federated selected Mr. Richardson before Mrs. Torre filed her formal complaint in May 1991. She relies only on informal instances of protected conduct. Even if Mrs. Torre established a sufficient temporal nexus between her informal conduct and Federated's selection of Mr. Richardson, the court concludes that Federated produced a legitimate, nondiscriminatory reason for selecting Mr. Richardson. Mr. Lauritzen and Mr. Haegele credibly and persuasively explained their decision to select Mr. Richardson. Mrs. Torre argued only that because she had higher production figures, she should have been selected. The evidence is clear that production is but one of many factors upon which selection may be based. The Monthly Leadership Council Award, unlike other Fed-erated awards, is not solely based on production figures. The court concludes that, as to the Monthly Leadership Council issue, her retaliation claim fails.

84. Mrs. Torre's fifth claim is that Federated retaliated by failing to recognize her as a Big Hitter at the Central Region's annual kickoff meeting. Mrs. Torre's production in 1991 qualified her to receive the Big Hitter Award. She was the only member of the Central Region to qualify for the 1991 award. Federated's practice was to acknowledge recipients at their respective regional kickoff meetings. When she received the award in 1990, she was recognized, along with the other recipients from the Central Region, at the Central Region's annual kickoff meeting. She filed a discrimination complaint in May 1991. Federated held its 1992 kickoff meeting in December 1991, seven months after she filed her complaint. Mr. Haegele did not present her with the award at the December 1991 meeting. He testified that he decided not to present her with the award at the meeting because the purpose of the meeting was to emphasize positive aspects of his Region's performance in the past year; since only one of sixty MRs qualified for the Big Hitter Award in 1991, he thought his Region's performance in the Big Hitter contest represented a Regional and personal failure. He simply did not want to emphasize such a perceived failure at a motivational gathering of his entire sales force and members of upper management. There is some question whether an adequate temporal nexus exists between the formal complaint and Mr. Haegele's actions at the kickoff meeting. Assuming that seven months is not too long to satisfy the causal connection element of her prima facie case,[55] the court concludes that Mrs. Torre establishes her prima facie case. Federated carried its step two burden of production by articulating a nondiscrimi-

**55.** In *Burrus v. United Telephone Co.,* 683 F.2d 339(1982), the Tenth Circuit explained that the causal connection element of the prima facie case "may be demonstrated by evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." *Burrus,* 683 F.2d at 343. It is unclear how close temporally the protected conduct and adverse actions must be in order to support an inference of retaliatory motive. There are no concrete parameters. The determination seems to be made on a case specific basis. For example, the Tenth Circuit has concluded that a two hour interval is sufficient to support the inference, *Love v. RE/MAX of America, Inc.,* 738 F.2d 383, 386 (10th Cir.1984), whereas a three year interval is not, *Burrus,* 683 F.2d at 343.

natory reason for the challenged adverse action. Although the question is close, the court concludes that Mrs. Torre failed to show that his reason was a pretext for discrimination. Critical to this conclusion is the court's determination that Mr. Haegele credibly and persuasively explained his reason for not recognizing Mrs. Torre at the meeting. In short, the court concludes that Mr. Haegele was motivated by selfishness, not retaliation.

## IV. *CONCLUSION*

**IT IS BY THE COURT THEREFORE ORDERED** that the clerk enter judgment for defendants and against Mrs. Torre on all of her remaining claims.

**IT IS FURTHER ORDERED** that defendant Federated's motion for an order to limit plaintiffs' May 8, 1995, response to Federated's motion for judgment as a matter of law or for a new trial (Doc. 301) is denied as moot.

**IT IS FURTHER ORDERED** that plaintiffs' damage request is denied as moot.